In re Donna G. THOMPSON, Debtor.

Fred W. WOODSON, Trustee, Plaintiff,

v.

FORD MOTOR CREDIT CO., and
Donna G. Thompson, Defendants.

In re Carol I. VANDIVER, d/b/a The
Wicker Shop, Debtor.

Fred W. WOODSON, Trustee, Plaintiff,

v.

FORD MOTOR CREDIT CO., and
Carol I. Vandiver, Defendants.

In re Paul David WALKUP and Anna
Maria Walkup, Debtors.

Fred W. WOODSON, Trustee, Plaintiff,

v.

FORD MOTOR CREDIT CO.,
and Defendant.

In re Michael Ray CLEM and Deborah
Key Clem, Debtors.

Fred W. WOODSON, Trustee, Plaintiff,

v.

FORD MOTOR CREDIT CO.,
and Defendant.

In re Robert D. ALLAN and Janice L.
Allan, Debtors,

Fred W. WOODSON, Trustee, Plaintiff,

v.

FORD MOTOR CREDIT CO.,
and Defendant.

In re Donald Jack RIDENOUR, Debtor.

Fred W. WOODSON, Trustee, Plaintiff,

v.

FORD MOTOR CREDIT CO.,
and Defendant.

In re Jeffrey Carlyle
DUCUMMON, Debtor.

Fred W. WOODSON, Trustee, Plaintiff,

v.

FORD MOTOR CREDIT CO.,
and Defendant.

In re Gerald Stephen COLLINS and
Jana Lynn Collins, Debtors.

Fred W. WOODSON, Trustee, Plaintiff,

v.

FORD MOTOR CREDIT CO.,
and Defendant.

In re Oliver Rannar KNOX and Dorothy
Marie Ellis Knox, Debtors.

Fred W. WOODSON, Trustee, Plaintiff,

v.

FORD MOTOR CREDIT CO.,
and Defendant.

Bankruptcy Nos. 86–01522–W, 86–01993–
W, 86–01563–W, 86–01568–W, 86–02486–
W, 86–02396–W, 87–00461–W, 87–
00605–W and 87–01141–W.

Adv. Nos. 86–0299–W, 86–0326–W, 86–
0519–W, 86–0569–W, 86–0736–W, 86–
0724–W, 87–0121–W, 87–0122–W and 88–
0018–W.

United States Bankruptcy Court,
N.D. Oklahoma.

June 30, 1989.

As Corrected July 5, 1989.

Fred W. Woodson, James W. Keeley, Gill and Keeley, Tulsa, Okl., for plaintiff.

Thomas G. Marsh, Marsh & Shacklett, P.C., Tulsa, Okl., for defendants.

## MEMORANDUM DECISION AND ORDER

MICKEY DAN WILSON, Bankruptcy Judge.

Fred W. Woodson, Trustee ("Trustee"), brought nine adversary proceedings, each under a different Chapter 7 bankruptcy

case, against Ford Motor Credit Corporation ("FMCC"), to determine ownership of, or priority of conflicting interests in, certain motor vehicles or their proceeds. The issue is whether written agreements concerning these vehicles, purporting to be leases, should be treated as unperfected security agreements.

Pursuant to orders filed October 29, 1986 and February 2, 1988, eight of the adversary proceedings were consolidated for trial; the ninth was added by amended stipulation filed May 18, 1988. Several sets of stipulations and briefs were filed, and evidence was taken at trial on May 11, 1988; thereafter the matter was taken under advisement. Upon consideration thereof, and of the record herein, the Court now finds, concludes and orders as follows:

## FINDINGS OF FACT

On November 12, 1985, Carol A. Vandiver, d/b/a The Wicker Shop ("Vandiver;" "Debtor"), filed her voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court.

On that date Vandiver was in possession of one 1984 Mercury Grand Marquis 4–door automobile, Vehicle Identification No. ("VIN") 1MEBP95FOEZ679470. Vandiver acquired the vehicle pursuant to a written agreement dated July 2, 1984, whereby Fred Jones Lincoln Mercury of Tulsa, Inc., as lessor purported to lease the vehicle to "The Wicker Shop" as lessee and at the same time to assign the lessor's interest to FMCC. On July 10, 1984, the State of Oklahoma issued a certificate of title listing FMCC as owner of said vehicle and indicating no liens thereon.

On June 24, 1986, Donna G. Thompson ("Thompson;" "Debtor") filed her voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court.

On that date Thompson was in possession of one 1985 Ford Escort automobile, VIN 1FABP1346FT166495. Thompson acquired the vehicle pursuant to a written agreement, bearing no legible date, whereby Fred Jones Ford of Tulsa, Inc., as lessor purported to lease the vehicle to Thompson as lessee and at the same time to assign

the lessor's interest to FMCC. On September 5, 1985, the State of Oklahoma issued a certificate of title listing FMCC as owner of said vehicle and indicating no liens thereon.

On June 27, 1987, Paul David Walkup and Anna Maria Walkup ("the Walkups;" "Debtors") filed their voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court.

On that date, the Walkups were in possession of one 1984 Ford Tempo 4–door automobile, VIN 1FABP22R5EKZ93150. Paul David Walkup acquired the vehicle pursuant to a written agreement, bearing no legible date, whereby Don Thornton Ford, Inc., as lessor purported to lease the vehicle to Walkup as lessee and at the same time to assign the lessor's interest to FMCC. On June 27, 1984, the State of Oklahoma issued a certificate of title listing FMCC as owner of said vehicle and indicating no liens thereon.

On June 30, 1986, Michael Ray Clem and Deborah Key Clem ("the Clems;" "Debtors") filed their voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court.

On that date, the Clems were in possession of one 1985 Ford Tempo 4–door automobile, VIN 2FABP22X1FB244747. The Clems acquired the vehicle pursuant to a written agreement dated June 20, 1985, whereby John Chandler Ford, Inc., as lessor purported to lease the vehicle to the Clems as lessees and at the same time to assign the lessor's interest to FMCC. On August 8, 1985, the State of Texas, Department of Highways and Transportation, Motor Vehicle Division issued a certificate of title listing "John Chandler Ford, Amarillo, Texas" as "Owner (If Lien Recorded)" and FMCC as "Lien Holder (Or Owner If No Lien)."

On September 18, 1986, Donald Jack Ridenour ("Ridenour;" "Debtor") filed his voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court.

On that date Ridenour was in possession of a 1984 Ford pick-up truck, VIN 1FTEF15F4EKA69664. Ridenour acquired the vehicle pursuant to a written agree-

ment, bearing no legible date, whereby Don Thornton Ford, Inc., as lessor purported to lease the vehicle to Ridenour as lessee and at the same time to assign the lessor's interest to FMCC. On June 11, 1984, the State of Oklahoma issued a certificate of title listing FMCC as owner of said vehicle and indicating no liens thereon.

On September 25, 1986, Robert D. Allan and Janice L. Allan ("the Allans;" "Debtors") filed their voluntary petition for relief under 11 U.S.C. Chapter 7 in this court.

On that date, the Allans were in possession of one 1984 Ford Mustang automobile, VIN 1FABP283XEF137066. Robert D. Allan acquired the vehicle pursuant to a written agreement, bearing no legible date, whereby Don Thornton Ford, Inc., as "lessor" purported to lease the vehicle to Allan as lessee and at the same time to assign the lessor's interest to FMCC. On March 6, 1984, the State of Oklahoma issued a certificate of title listing FMCC as owner of said vehicle and indicating no liens thereon.

On February 24, 1987, Jeffrey Carlyle Ducummon ("Ducummon;" "Debtor") filed his voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court.

On that date Ducummon was in possession of one 1985 Ford Ranger pick-up truck, VIN 1FTBR10C0FUC15426. Ducummon acquired the vehicle pursuant to a written agreement dated April 8, 1985, whereby Turnpike Ford, Inc., as lessor purported to lease the vehicle to Ducummon as lessee and at the same time to assign the lessor's interest to FMCC. On April 10, 1985, the State of Oklahoma issued a certificate of title listing FMCC as owner of said vehicle and indicating no liens thereon.

On March 11, 1987, Gerald Stephen Collins and Jana Lynn Collins ("the Collinses;" "Debtors") filed their voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court.

On that date, the Collinses were in possession of one 1985 Ford Bronco II automobile, VIN 1FMBU14S4FUB92907. Stephen Collins acquired the vehicle pursuant to a written agreement dated April 18, 1985, whereby Fred Jones Ford of Tulsa, Inc., as lessor purported to lease the vehicle to Collins as lessee and at the same time to assign the lessor's interest to FMCC. On April 24, 1985, the State of Oklahoma issued a certificate of title listing FMCC as owner of said vehicle and indicating no liens thereon.

On April 29, 1987, Oliver Rannar Knox and Dorothy Marie Ellis Knox ("the Knoxes;" "Debtors") filed their voluntary petition for relief under 11 U.S.C. Chapter 7 in this Court.

On that date the Knoxes were in possession of one 1985 Ford pick-up truck, VIN 1FTDF15Y4FPA80200. Oliver R. Knox acquired the vehicle pursuant to a written agreement dated March 19, 1985, whereby Don Thornton Ford, Inc., as lessor purported to lease the vehicle to Knox as lessee and at the same time to assign the lessor's interest to FMCC. On March 25, 1985, the State of Oklahoma issued a certificate of title listing FMCC as owner of said vehicle and indicating no liens thereon.

FMCC has not filed any lien entry forms relating to the above-mentioned vehicles ("the Vehicles") with the Oklahoma Tax Commission or its agents.

Fred W. Woodson is the duly appointed, qualified and acting Trustee in all of the above-mentioned Debtors' estates in bankruptcy.

The Trustee filed complaints, alleging in substance that FMCC's interest in each vehicle is a seller's or lender's security interest and not a lessor's ownership interest, and that such security interest is unperfected; and seeking determination that the Trustee's interest in each vehicle is prior and superior to FMCC's unperfected security interest therein.

FMCC answered the Trustee's complaints, alleging that the agreements whereby Debtors acquired the vehicles were leases, and asserting that FMCC was not mere holder of an unperfected security interest in, but was true owner of, each vehicle.

The parties agreed that FMCC would take possession of the vehicles, sell them,

and deliver the proceeds (less costs) to the Trustee, who would hold said proceeds pending disposition of these actions. The nine actions were consolidated for trial and decision.

On March 15, 1988, the parties filed their second "Stipulation of Facts," and on May 18, 1988, filed their "Amended Stipulation of Fact."

Attached to and included in said stipulation(s) are copies of eight of the written agreements whereby Debtors acquired these vehicles. The ninth agreement, involving the Knoxes, was not attached to the stipulation or amended stipulation, but was intended to be incorporated therein; a copy of that written agreement is attached to the complaint in that adversary proceeding.

All of the written agreements are pre-printed forms, with blanks for filling in details such as parties' names, vehicle descriptions, and monetary amounts. According to the stipulations, the written agreements "are all identical except for certain numerical and identifying information which has been inserted in them," Amended Stipulations ¶ 9. This is not entirely correct. The agreements by Vandiver, Walkup, Ridenour and Allan are labeled "FMCC 167 10–P SEP 81 WOR" and include numbered paragraphs 1–15 on the front side of the form and 16–26 on the back; the agreements by Clem, Ducummon, Collins and Knox are labeled "FC 16722–P JAN 84 WOR" and include numbered paragraphs 1–15 on the front side of the form and 16–28 on the back; the agreement by Thompson appears to be labeled "FC 16722 P FEB [illegible] WOR" and includes numbered paragraphs 1–15 on the front side and 16–28 on the back. The 28–paragraph form includes numbered paragraphs entitled "Excess Wear and Tear" (¶ 16) and "Termination—Life Insurance" (¶ 20) which are not included as such in the 26–paragraph form; but the substance of the "Excess Wear and Tear" paragraph appears elsewhere on the front side of the 26–paragraph form, and the life insurance provisions on the 28–paragraph form are not invoked and so may be treat-ed as immaterial. Thus the two forms, even if not literally identical, are substantially alike. Insofar as they are alike, all of the written agreements will be referred to collectively herein as "the form(s)." Where appropriate, the 28–paragraph versions "FC 16722–P JAN 84 WOR" or "FC 16722 P FEB [illegible] WOR" will be distinguished as "the long form," and the 26–paragraph version "FMCC 167 10–P SEP 81 WOR" will be distinguished as "the short form."

The form is printed by FMCC. It is entitled "Net (Closed End) Lease/Purchase Option". It identifies a local car dealer as "Lessor" but provides for assignment of the lessor's interest to FMCC simultaneous with initial execution of the lease. It identifies each Debtor or customer as "Lessee."

The form provides for lease over a selected term of months; for an initial payment which may include "Capitalized Costs Reduction," "Trade-in Allowance," "Refundable Security Deposit," "Refundable Reconditioning Reserve," "Advance Monthly Payment," "Registration Fees," and "Certificate of Title Fee;" and regular monthly payments consisting of "Monthly Rental" plus "Use or Rental Tax" and optional "Insurance Charge" and "Maintenance Charge." Blanks are provided whereby specific numbers and amounts may be assigned to these categories, form ¶¶ 1–6.

In every lease before this Court, the chosen term was 48 months.

Although most of the written agreements before this Court do not so indicate, the parties stipulate that, in every case, the lessee was responsible for paying initial excise tax and registration fees on each vehicle.

The security deposit or reconditioning reserve would be used to refit the vehicle after its return to the lessor, long form ¶¶ 26, 27, short form ¶¶ 24, 25.

The form provides that "Whether or not the vehicle is insured, the Lessee must still pay rent for the Vehicle during the term of this Lease if the Vehicle is lost, damaged or destroyed." On the other hand, "If the lessee keeps possession of the vehicle past the end of the lease term, the lessee shall

continue to pay the monthly rental payments," although "That payment shall not permit the Lessee to keep the vehicle." See Form p. 1, col. 1.

The form also provides for an "Excess Mileage Charge," with blanks which are invariably filled in to provide a charge of $.06 per mile for every mile driven in excess of 60,000 miles; and recites that "The Lessor and the Lessee believe that this will be the maximum mileage that the Vehicle will be driven over the term of the Lease," form ¶ 12.

The form provides an option to purchase the leased vehicle "at the end of the lease" for a specified amount, Form ¶ 14. This amount is usually equal to another figure, called "lease-end residual value of the Vehicle," said to be agreed between the dealer and FMCC pursuant to assignment of the lessor's interest, Form ¶ 14, and p. 2 "Assignment."

The form provides for voluntary early termination of the lease by agreement among lessee, dealer and FMCC. "Except by agreement ... the Lessee may terminate this lease early only if he returns the Vehicle to the lessor and he pays all amounts that he owes under this Lease," long form ¶ 19, short form ¶ 18.

The form provides that, if the lessee defaults, the balance due under the lease will be accelerated. The lessor "may" repossess the vehicle; but it is taken for granted that the lessor will sell the vehicle and "will subtract from the amount owed sums received from the sale of the Vehicle in excess of what the Lessor would have had invested in the Vehicle at the end of the lease term," long form ¶ 21, short form ¶ 19.

No provision of the form unambiguously states what happens when the option to purchase is not exercised and the vehicle is returned without default or hold-over at the end of the full lease term.

The form provides that "The lessee must insure the Vehicle ... This insurance must protect the Lessee and FMCC ... with a deductible amount of not more than $250.00 ... The Lessor may buy the insurance if the Lessee does not ... If the Lessor buys the insurance, the Lessee must pay back to the Lessor the cost of the insurance ... The Lessee assigns to [FMCC] any monies paid under the insurance, by whomever obtained ...," Form p. 1, col. 1.

The form provides that "The Lessee will indemnify the Lessor and [FMCC] from any loss or damage to the Vehicle or its contents during the term of this Lease ... also ... from all claims, losses, and costs arising out of the use or condition of the Vehicle. The Lessee will pay all fines imposed upon the Vehicle or on any driver of the Vehicle ...," long form ¶ 25, short form ¶ 23.

The form requires lessee to "provide and pay for all gas, oil and anti-freeze ... keep the Vehicle in good order and see that all needed repairs are made ... at least as often as set forth in the owner's manual," Form p. 1, col. 1. The form provides an option whereby the dealer "will provide and pay for the services set forth," but in no instance is this option invoked, and in any event FMCC is exempted from any such requirements, Form p. 1, col. 1. The form also requires lessee to "pay the costs of all repairs to the Vehicle that are not the result of norman wear and tear," long form ¶ 16, short form page 1.

The form provides that "The Lessee may receive a separate written warranty on the Vehicle. Under this lease, however, there is no promise as to the merchantability, suitability or fitness for purpose of the Vehicle. This means that there is no promise that the Vehicle will be fit for use for any particular purpose or even that it will be fit for the normal purpose for which a vehicle is used," long form ¶ 17, short form ¶ 16.

The form contains an integration clause, long form ¶ 28, short form ¶ 26, yet refers to other documents, e.g. under "Vehicle Maintenance and Operating Costs," under "Warranty," and under "Assignment."

Vandiver's contract, dated July 2, 1984, establishes an initial payment of $375.00 "Refundable Reconditioning Reserve" plus $356.00 "Advance Monthly Payment;"

monthly payments of $336.04 "Monthly Rental" plus $20.16 "Use or Rental Tax;" total payments over term of $7,097.60; $1,000.00 "Fees and Taxes" perhaps not included in total payments over term; and "residual value" equivalent to option purchase price of $6,318.00. The manufacturer's suggested retail price of this vehicle was $16,626.00. The option purchase price is approximately 36% of manufacturer's suggested retail price.

Thompson's contract establishes an initial payment of $200.00 "Refundable Reconditioning Reserve" plus $186.25 "Advance Monthly Payment;" monthly payments of $175.29 "Monthly Rental" plus $10.96 "Use or Rental Tax;" total payments over term of $8,940.00; $425.00 "Fees and Taxes" perhaps not included in total payments over term; and "residual value" equivalent to option purchase price of $3,278.52, insofar as these amounts can be determined from incomplete or illegible copies of documents provided to the Court. The manufacturer's suggested retail price for this vehicle was $8,402.00. The option purchase price is approximately 39% of manufacturer's suggested retail price.

Walkup's contract establishes an initial payment of $200.00 "Refundable Reconditioning Reserve" plus $195.01 "Advance Monthly Payment" plus $124.25 in "Registration," "Certificate of Title," and "Affidavit" fees plus $186.00 "Excise Tax;" monthly payments of $183.97 "Monthly Rental" plus $11.04 "Use or Rental Tax;" total payments over term of $9,360.48; $1,059.84 "Fees and Taxes" perhaps not included in total payments over term; no stated residual value; and option purchase price of $4,462.24. The manufacturer's suggested retail price of this vehicle was $9,696.00. The option purchase price is approximately 46% of manufacturer's suggested retail price.

Clem's contract dated June 20, 1985, establishes an initial payment of $225.00 "Refundable Security Deposit" plus $220.29 "Advance Monthly Payment;" monthly payments of $220.29 "Monthly Rental;" total payments over term of $10,573.92; no stated "Fees or Taxes;" and option purchase price of $4,113.70—"residual value" is not ascertainable from incomplete copies of documents provided to the Court. The manufacturer's suggested retail price of the vehicle was $9,093.00. The option purchase price is approximately 45% of the manufacturer's suggested retail price.

Ridenour's contract establishes an initial payment of $300.00 "Refundable Reconditioning Reserve" plus $285.25 "Advance Monthly Payment;" monthly payments of $269.10 "Monthly Rental" plus $16.15 "Use or Rental Tax;" total payments over term of $13,692.00; $1,550.00 "Fees and Taxes" perhaps not included in total payments over term; and "residual value" equivalent to option purchase price of $6,117.52. The manufacturer's suggested retail price of this vehicle was $12,652.66. The option purchase price is approximately 48% of manufacturer's suggested retail price.

Allan's contract establishes an initial payment of $250.00 "Refundable Reconditioning Reserve" plus $243.98 "Advance Monthly Payment" plus $128.25 "Registration" and "Certificate of Title Fees" plus $221.00 "Excise Tax;" monthly payments of $230.17 "Monthly Rental" plus $13.81 "Use or Rental Tax;" total payments over term of $11,711.04; $662.88 "Fees and Taxes" perhaps not included in total payments over term; and "residual value" equivalent to option purchase price of $4,919.00. The manufacturer's suggested retail price of this vehicle was $11,440.00. The option purchase price is approximately 43% of manufacturer's suggested retail price.

Ducummon's contract establishes an initial payment of $175.00 "Refundable Reconditioning Reserve" plus "Advance Monthly Payment" of $160.12; monthly payments of $155.46 "Monthly Rental" plus $4.06 "Use or Rental Tax;" total payments over term of $7,685.94; no stated "Fees and Taxes;" and "residual value" equivalent to option purchase price of $3,204.47. The manufacturer's suggested retail price was $7,121.05. The option purchase price is approximately 45% of the manufacturer's suggested retail price.

The Collins' contract establishes an initial payment of $225.00 "Refundable Recondi-

tioning Reserve" plus $213.32 "Advance Monthly Payment;" monthly payments of $201.25 "Monthly Rental" plus $12.07 "Use or Rental Tax;" total payments over term of $10,239.36; $450.00 in "Fees and Taxes" perhaps not included in total payments over term; a "residual value" of $5,812.07; and an option purchase price of $5,900.00. The manufacturer's suggested retail sale price of this vehicle was $11,545.00. The option purchase price is approximately 51% of the manufacturer's suggested retail price.

The Knoxes' contract establishes an initial payment of $225.00 "Refundable Reconditioning Reserve" plus $206.34 "Advance Monthly Payment;" monthly payments of $194.66 "Monthly Rental" plus $11.68 "Use or Rental Tax;" total payments over term of $9,904.32; $1,221.28 "Fees and Taxes" perhaps not included in total payments over term; and "residual value" equivalent to purchase option price of $4,718.54. The manufacturer's suggested retail price was $10,757.90. The option purchase price is approximately 44% of the manufacturer's suggested retail price.

The lease form was drafted, and FMCC's lease program is administered, under the supervision of Clifford R. Damaska ("FMCC's lease manager"), who testified at length at trial on May 11, 1988.

The form was created in 1981 (and modified only slightly thereafter) as a replacement for FMCC's previous "open-end lease" which some courts had held to be the equivalent of a security agreement. The previous "open-end lease" had expressly required sale of the car after the lease term had expired, application of sale proceeds against residual value, satisfaction by the lessee of any deficiency under the stated residual value and acquisition by the lessee of any surplus over the stated residual value. The new "net closed-end lease" eliminated the express requirement of sale and express residual liability or expectancy of the lessee.

A customer entering a Ford dealership would be offered the alternatives of purchase or lease of the vehicle of his choice. Between 1984 and 1986, FMCC through its dealers offered lease periods of "from 12 through 48 months," transcript p. 18. The lease period and other terms would be negotiated between the dealer and the customer, the dealer operating within certain limits prescribed by FMCC. The starting point for negotiations was the manufacturer's suggested retail price. This figure would be multiplied by a factor prescribed by FMCC and reflecting a combination of the lease period (e.g. 12–24–36–48 months) and FMCC's own estimate or projection of the vehicle's value at term end, said to be based on historical and market data and representing a guesstimate of actual fair market value at lease term end. The product of manufacturer's suggested retail price multiplied by FMCC's factor would yield a "maximum residual value." This figure was then subtracted from FMCC's "acquisition cost" (the amount FMCC would pay the dealer for assignment of the lease, usually a bit less than manufacturer's suggested retail price). The difference between acquisition cost and maximum residual value, divided by the lease period, plus a "use fee" set by FMCC, made up the monthly rent. The customer could lower the monthly rent by paying more money "up front"—in the form of "Capitalized Cost Reduction," "Trade-in Allowance," etc. In theory, the dealer might agree to lower the monthly rent by adding the difference to "residual value;" but under no circumstances was a dealer permitted to *raise* the "residual value" beyond the calculated "maximum residual value" amount. On the other hand, the dealer could try to *lower* the "residual value" as much as possible; as residual value went down, monthly rent would go up, and the only limit to the increase in monthly rent was the customer's willingness to pay it. If the lessor was required to pay any insurance, maintenance, registration and title fees, or other expenses, the monthly rent would be increased still further to make up for it; alternatively, the lessee could be required to pay such costs directly. Because of these variables, the initial payment, monthly payments, and residual value or option purchase price could vary from lease from to lease even as to similar vehicles, tran-

script page 45. The terms arrived at between dealer and customer were subject to review by FMCC. FMCC's main consideration was the credit-worthiness of the customer, measured against the length of the lease term and the size of the agreed-upon residual value.

FMCC's lease manager testified that a security deposit or reconditioning reserve was required "in virtually every lease," transcript p. 11.

FMCC's lease manager testified that the lease provisions for excess mileage charges did not appear in FMCC installment sales or security-agreement contracts.

FMCC's lease manager characterized the lease rental payments as compensation for use plus depreciation, transcript pp. 12, 33–34. He further testified that monthly rental payments under the leases might be 25%–30% less than installment payments on comparable vehicles under FMCC installment sales or security-agreement contracts. Nevertheless, he further testified that there "would be a fairly constant or comparative outlay for the use of the vehicle, whether owned or leased," transcript p. 56.

Although the lessee might theoretically be liable under the lease indemnity provisions for the insurance deductible amount of $250, in practice FMCC writes off the $250 deductible, and only pursues the lessee if there was a more significant lapse in or failure to obtain any insurance coverage. A larger deductible might be allowed, but only on FMCC's specific approval. When asked, "If a leased vehicle is involved in an accident that resulted in a total loss, who would receive the insurance proceeds?" FMCC's lease manager answered, "We would as owner of the vehicle," transcript p. 15. FMCC itself carries excess liability insurance in case it is sued as owner of the vehicle and is not covered by other insurance.

FMCC does not re-lease vehicles after lease end or early termination. The vehicles are sold, because, according to FMCC's lease manager, sale is "The only way to determine actual value as compared with calculated residual value," transcript

p. 29. Also, according to FMCC's lease manager, "There just isn't a market of any substance for used vehicle leasing," transcript page 30. The Court takes judicial notice of the availability of cars for hire at many or most airports in the United States; and of not quite five full pages of advertisements in the Tulsa, Oklahoma yellow pages under the heading "Automobile Renting and Leasing," most of which purport to offer rental of used automobiles for shorter or longer terms.

On occasion, FMCC has suffered a loss upon return and sale of a vehicle after lease end.

Four items of promotional literature regarding the leases were admitted as Exhibits 45–48. Although admitted without objection, these documents do not necessarily form part of the contract between the parties—especially since at least one of the documents, Exhibit 46, is dated "Nov 85" and therefore postdates the lease contracts herein. Nevertheless, the promotional items are of some use in indicating FMCC's implementation of and expectations under the leases.

Exhibits 45 and 48 are promotional in the strict sense, i.e., they are advertisements designed to attract potential lessees.

Exhibit 45 is entitled "Red Carpet Lease Vehicle Leasing Plan/For the Discriminating Driver." It makes a great pother about "the old fashioned virtues of value, courtesy and service ... our old fashioned concern for you ... old fashioned value and customer satisfaction ... old fashioned service that you deserve ... OLD FASHIONED CONCERN ... OLD FASHIONED QUALITY ... OLD FASHIONED COURTESY ...," compared and combined with "the modern concept of leasing the vehicle of your choice ... the most up-to-date method to handle your transportation needs ... MODERN LEASES ... MODERN CONVENIENCE ... MODERN RECORDS ... MODERN CARE ... MODERN METHODS ..." It states that "all you have to do is meet our normal credit standards." It offers "to give you all the advantages of vehicle use while we handle the nagging details of ownership for you,"

helping the customer "avoid the petty details of auto financing and ownership." It indicate that leases may vary according to whether," [f]or example ... you want to limit your lease-end responsibilities" or "you are a low mileage driver and the amount of monthly rental is your major concern ..." It invites a continuing relationship in the following terms:

We won't be satisfied with just introducing you to our Red Carpet Lease plan one time. We want to continue to care for your transportation needs on a regular basis. As a Red Carpet Lease customer all you must do at vehicle replacement time is let us know what your needs are. As long as you continue to meet our credit standards, we will have your new car or truck built to your individual specifications and arrange with you to pick it up at your convenience. Best of all, there's no need to negotiate a trade-in value. Just complete your previous lease obligations, turn in your old car and pick up your new one—all in just minutes.

Exhibit 4 is entitled "Red Carpet Lease/A Convenient Way to Fill Your Transportation Needs." It states that "[a]s a general rule, if our application is acceptable for financing it's also acceptable for leasing ... In most cases, qualifying for a lease is no different than qualifying to finance a vehicle'" and describes the lease as "an alternative to financing ... new cars." It also describes the lease as "an alternative to owning a new vehicle," and informs owners that "[i]f you usually don't finish paying for a car before you trade again ... or if you pay it off and then immediately look for a replacement ... the Red Carpet Lease plan is made to order for you ... It's the contemporary way to obtain the new vehicle of your choice. Many people who have no intention of keeping their vehicles for five or ten years have turned to Ford Credit's Red Carpet Lease plan ... If you usually don't finish paying for your car before you trade again, or if you look for a replacement immediately after you pay off your car, a Red Carpet Lease is great." The main advantage to the lease is that "[o]n the

same car, monthly lease payments are usually lower than monthly finance payments because you pay only for the value you use ... you pay a monthly payment for the use of the vehicle—your payments don't include the cost to accumulate equity. It's simply the idea of paying for the value of the product you use up instead of the full price of the car ... You pay a monthly payment for the use of the vehicle, and these payments can be lower than payments on a financed vehicle because you're not paying for the entire price of the car ... Your monthly payment is for the use of the car—it doesn't include the cost to accumulate equity ... Monthly lease payments are usually lower than monthly finance payments because you're not paying for the entire price of the car ... your monthly lease payment is lower than a retail financing payment." Also, "your initial cash outlay is substantially lower than the cash investment needed in the financing of a retail purchase." Nevertheless, answering the question "Is leasing more expensive than buying?" the pamphlet states "[g]enerally, the costs are comparable." Other factors mentioned are that "[y]our leased vehicle will carry the same warranty as a purchased vehicle and you generally have the same maintenance responsibilities as an owner would, unless your lease specifies otherwise ... You must obtain physical damage and liability insurance ... from your own agent ... There's no trade-in hassle ... At the end of the lease, you may turn in your vehicle and walk away with no further obligation if there is no excess wear and tear or excess mileage ... A Red Carpet Lease generally has a mileage allowance of 15,000 miles per year. For any mileage over that amount, a lessee ... would pay six cents a mile ... if you normally drive more than 15,000 miles a year, tell your salesperson during lease negotiations. He or she can make necessary adjustments to your monthly lease payment ... in order to minimize end of lease mileage charges." Despite references to 15,000 miles as the standard above which mileage charges accrue, the pamphlet's "Example of Typical Transaction" lists a "Mileage Penalty Over 60,000 ... 6¢

per mile." The question "If I lease, can I trade before my lease is up?" is answered as follows: "Only if a special agreement is reached between you, your dealer and Ford Credit. Remember, early termination may be costly because depreciation and certain other items normally collected over the life of a lease must be spread over a shorter period."

Exhibit 46 is entitled "Red Carpet Lease/Welcome" and is sent to new lessees for the purpose of "giving them some general knowledge of their responsibilities and options and such under the lease agreement that they have just entered into," transcript p. 38. This document states that "Leases do not contain an interest charge, therefore, interest tax deductions are not available. Lessees using vehicles for business purposes may be entitled to a tax deduction ... early termination can be granted when mutually agreed upon by your Dealer and Ford Credit. Early terminations can result in substantial added costs because the vehicle depreciation and other costs must be compressed into a shorter time period. Changing your mind and returning your vehicle in mid-contract can be expensive ... You are responsible for making your regular monthly payment even if your vehicle is not available due to needed repair time ... You are responsible for making your regular monthly payments during the time your vehicle is being repaired ..." After an accident, "[i]f the insurance company determines your vehicle to be a total loss, they will either replace your totaled vehicle or make a cash settlement. In either case, contact your Ford Credit servicing branch for further instructions."

Exhibit 47 is a sticker which, among other things, recites "Price based on manufacturer's suggested retail price including tax and destination charges" and "Lease subject to credit approval and insurability as determined by Ford Credit."

Evaluation of the above evidence, and determination of certain ultimate facts, according to legal standards to be discussed, form an inseparable part of the Court's "Conclusions of Law" in these cases. Ac-

cordingly, any "Conclusions of Law" which ought more properly to be "Findings of Fact" are incorporated herein by reference.

## CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(E), (K), (O), 11 U.S.C. §§ 541(a)(1), 544(a).

The general nature of an inquiry into whether a purported lease should be treated as a secured transaction was explained at length in *In re Breece,* 58 B.R. 379 (B.C., N.D.Okla.1986) and summarized in *In re Harvey,* 80 B.R. 533, 537 (B.C., N.D.Okla. 1987), and need not be repeated here.

The leases in question here were entered into in 1984 and 1985. On November 1, 1988, new 12A O.S.A. (1989 Supp.) Article 2A and related provisions took effect, Laws 1988, c. 86 § 82. The new Article 2A itself does not apply to transactions which create security interests, 12A O.S.A. (1989 Supp.) §§ 2A–102, 2A–103(1)(j), 9–102(1)(a), (2). However, a related amendment to the definition of "security interest" 12A O.S.A. (1989 Supp.) § 1–201(37) might affect the classification of the transaction at bar as "lease" or "security interest."

These 1988 amendments, including the amendment to 12A O.S.A. (1989 Supp.) § 1–201(37), do not apply to transactions entered into before the effective date of the amendments, 12A O.S.A. (1963) §§ 10–101, 10–103, 12A O.S.A. (1989 Supp.) § 11–101; and see comments of Fred H. Miller, 12A O.S.A. (1989 Supp.) p. 78. The amendments themselves are said to "clarify" prior law, and to that extent might be read back into prior transactions, as was done in *In re Cole: Woodson v. Ford Motor Credit Co.,* 100 B.R. 561, B.C., N.D. Okla., Covey, J. (1989), p. 4 FF. But, even though the amendments purport to "clarify" the prior Commercial Code *text,* they certainly are meant to alter some case law interpreting and applying that prior text; and to that extent these amendments do change prior *law.* For example, it appears that, under prior law in this Circuit, a "lease" containing a option purchase whose price is less than 25% of list price is deemed a secured transaction, *In re Fashion Opti-*

cal, Ltd., 653 F.2d 1385, 1389 (10th Cir. 1981), *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.*, 387 F.Supp. 882, 885 (W.D.Okla.1973) aff'd 532 F.2d at 171–172; while it appears that the 1988 amendments may modify or abrogate this *per se* rule, amended 12A O.S.A. (1989 Supp.) § 1–201(37)(b), (c). Since the amendments may indeed change prior law in some respects, this Court could distinguish change from "clarification" only by first conducting an extensive analysis and evaluation of this admittedly inapplicable statute.

This Court does not consider so dangerous an exercise in "clarification" to be appropriate under the circumstances, since it would tend in practice toward either an advisory opinion on, or a retroactive application of, a complex and inapplicable statute; and since prior law is sufficiently clear and workable on its own terms. Accordingly, this Court will not follow *In re Cole,* supra, in this respect; but will consider these pre–1988 leases under pre–1988 statutory and case law alone, without further reference to the text of or comments on the 1988 amendments. This Court will interpret the 1988 amendments only in a proper case, involving a transaction to which those amendments *directly* apply.

Therefore, this Court will proceed under *In re Breece,* supra, *In re Harvey,* supra, and authorities cited therein, primarily *In re Fashion Optical, Ltd.,* supra, and *In re Tulsa Port Warehouse Co.*, 690 F.2d 809 (10th Circ.1982) aff'g 4 B.R. 801, 29 U.C. C.R. 1608 (N.D.Okla.1980) aff'g unreported decision, B.C., N.D.Okla. per Rutledge, J., No. 79–B–1085, March 6, 1979—hereinafter referred to as *"Tulsa Port."*

■ A transaction purporting to be a lease will be deemed a secured transaction if "a option purchase exists and it or other items in the 'lease' permit the 'lessee' to become full owner by merely paying no or nominal consideration after complying with its terms," *In re Fashion Optical, Ltd.,* supra, 653 F.2d p. 1388.

The form of agreement herein contains a option purchase. The question is whether

such option permits the lessee to buy the vehicle for "no or nominal consideration."

"The percentage that option purchase price bears to the list price, especially if it is less than 25% is to be considered as showing the intent of the parties to make a lease as security," *In re Fashion Optical, Ltd.,* supra, 653 F.2d p. 1389.

In all nine of these leases, the option purchase price is well over 25% of the manufacturer's suggested retail sales price, ranging from 36% to 51% of manufacturer's retail sales price.

■ Option purchase price may be "nominal" regardless of any percentage to list price, "[w]here the terms of the lease and option to purchase are such that the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods," *In re Fashion Optical, Ltd.,* supra, 653 F.2d p. 1389.

■ In these leases, the absolute size of the option purchase ranges from $3,204.47 to $6,318.00; and, as noted above, represents from one-third to one-half of the original purchase price of each item. Lessees might well decline to exercise so expensive an option; the Court cannot say that "the only sensible course for the lessee ... is to exercise the option and become the owner of the goods."

The Court concludes that the Trustee has failed to show that the option purchase price is nominal.

"If the option does require greater than nominal consideration for full ownership, a true lease is usually found," *In re Fashion Optical, Ltd.,* supra, 653 F.2d p. 1389. However, "usually" does not mean invariably. "Thus, even though nothing in the 'lease' may permit purchase at nominal consideration, the 'lease' will still be deemed one intended as security if the facts otherwise expose economic realties tending to confirm that a secured transfer of ownership is afoot," id., citing *Tulsa Port,* 4 B.R. 801, 29 U.C.C.R. 1608, 1612–1613 (N.D. Okla.1980) aff'd 690 F.2d 809 (10th Cir. 1982). This Court reviewed and analyzed the *Tulsa Port* doctrine at length in *In re*

*Breece,* supra, and applied it in *In re Harvey,* supra. Those principles must now be applied herein. In those cases, secured transactions were shown by: (1) the concentration of all incidents of ownership of the vehicles, save bare legal title, in lessee; (2) the effect of termination provisions, which established an equity in the vehicles in lessee and removed any reversionary interest from lessor; (3) economic equivalence of the transactions with secured sales or loans.

In the transactions herein, title to each vehicle remains in the lessor or the lessor's assignee FMCC. However, lessees are required to pay all fees, taxes and penalties; and to assume the burden and expense of maintenance and repair, both ordinary and extraordinary. "As a practical matter, the. lessee [holds] all the incidents of ownership except bare legal title" *In re Breece,* supra, 58 B.R. p. 387 quoting *Tulsa Port* supra, 690 F.2d p. 812. In this respect, these leases are equivalent to secured transactions.

Before attempting to evaluate the effect of the termination provisions in these leases, the actual operation of those termination provisions must be determined. The form describes itself as a "closed-end" lease, which is understood to mean a lease wherein the parties owe no continuing obligations to each other after expiration of the lease term. This is in contradistinction to an "open-end" lease wherein the parties' reciprocal obligations continue after the end of the lease term—in particular, the lessor is *required* to sell the leased vehicle, extinguishing any reversionary interest that would ordinarily inhere in a true lessor; while lessee bears the risk of loss or expectancy of gain upon sale of the leased item, as if he and not lessor were the true owner. Such "open-end" leases have been held to amount to security agreements, *Tulsa Port,* supra; *In re Breece,* supra. FMCC now argues that the "closed-end" leases herein are true leases, because they lack the obnoxious "open-end" provisions. But a lease is not necessarily a "closed-end" type merely because it says it is; its provisions must be examined in detail to ascertain whether or to what extent they really do differ from the "open-end" type.

In the cases now before this Court, it is clear from the leases themselves that, on default or early termination, the leased vehicle will be sold. In this respect, there is no difference between this so-called "closed-end" lease and the "open-end" type held to be a secured transaction. These leases are silent as to what happens to the leased vehicle after expiration of the full term; there is no evidence of collateral agreements that would require sale of the vehicle, or would assign any continuing liability to either party, absent default and after expiration of the full lease term. In this respect, these leases differ from the "open-end" type.

On default or early termination, the balance due for rent over the entire lease term is accelerated, the vehicle is sold, and sale proceeds are credited against the sum of unpaid rent plus residual value. Whether lessee must pay any deficiency is unclear— arguably, he must pay any deficiency, under the guise of liability for "any damages caused to the lessor because of the lessee's default," long form ¶ 21, short form ¶ 19, since residual value is said to represent FMCC's remaining investment in the vehicle, long form ¶ 21, short form ¶ 19, transcript pp. 29–30, and failure to recover this amount from sale proceeds would "damage" FMCC to that extent.

If the lease expires without default or early termination, rent will have been entirely paid out and there will be no balance due; the lessee returns the vehicle, the lessor sells it and applies sale proceeds against residual value. No provision in the lease expressly makes the lessee liable for any deficiency, nor does any provision in the lease entitle the lessee to any surplus. In this regard, these leases differ from "open-end" types.

The question is whether these provisions create an equity in the lessee or extinguish a reversion in the lessor.

It is often said that a purported lease will be deemed a security agreement if its provisions establish an equity in the lessee. Exactly what this means is unclear.

In a sense, whenever rent payments are credited against purchase price, a lessee acquires some equity in the leased item. The clearest example would involve a leased item whose value does not depreciate. If, for example, the lessee has paid rent for four years and then wants to buy the item, but must buy it for its full value at time of purchase, then it can be said that the lessee has acquired no equity in the item—his rental payments compensate the lessor for the item's *use* and nothing more; acquisition of the item's value or ownership requires a whole new investment. But if the lessee has paid rent for four years and then wants to buy the item, and is able to credit some significant part of the "rental" payments against the item's full value at time of purchase, obviously the lessee must have acquired some equity in the item. In the latter case, the "rent" must contain not only a use charge but a hidden payment for value, and a court might justifiably treat the transaction as a disguised sale or purchase-money loan from its inception. This simple example is complicated and obscured when the item is highly depreciable, as is an ordinary automobile. As the period of the lease winds down, the value of the item also diminishes; at end of the lease period, the lessee may be able to buy the item for far less than its original purchase price, but this may be due to the item's decline in value as much as to some credit against value concealed in the "rent." Moreover, a lessor could be expected to take the decline in value into account in setting the amount of rent— which would thus include a legitimate credit against value in the form of compensation for depreciation. Where an item is highly depreciable, it may become all but meaningless to try to distinguish between "compensation for use," "compensation for depreciation," and "credit against purchase price." Where, at the end of the lease period, the lessee is able to buy the item for *less than* current fair market value, a purchase-price component hidden in "rent" may be presumed, and it can be said with confidence that the lease allows the lessee to acquire an equity in the item and so should be treated as a disguised sale or purchase-money loan. Where, at the end of the lease term, the lessee can buy the item for *no less than* current fair market value, it is not clear that an equity in this sense is being acquired, and the transaction cannot with confidence be treated as a sale or purchase-money loan. In the cases now before this Court, the evidence indicates that the option purchase price is at least roughly equivalent to actual fair market value at the end of the lease period. It does not clearly appear that the lessees are acquiring any equity, in the sense just discussed.

It is sometimes said that termination provisions of open-end type which place the real risk of loss or expectancy of gain on disposition of the items in the lessee, amount to an equity in the lessee. In the cases now before the Court it is unclear, at least where the lease runs full term, whether lessee or lessor bears the real risk of loss or expectancy of gain. The contracts do not expressly assign risk and expectancy to the lessee; FMCC's lease manager testified that the lessor bears the risk of loss or expectancy of gain; and even if the lease indemnity provisions do effectively assign the *risk* to lessee, nothing seems to assign the *expectancy* to lessee. The burden of persuasion is on the plaintiff Trustee; and in this regard, that burden has not been met.

In *Tulsa Port,* supra, and *In re Breece,* supra, the "open-end" termination provisions expressly required the lessor to sell the leased vehicles after the expiration of the lease term. In *Tulsa Port* the District Court observed that, after expiration of a true lease, the lessor "can do as he pleases with his property," *id.,* 4 B.R. at 805. In *In re Breece,* supra, 58 B.R. p. 385, this Court noted that "[i]t is indeed a curious 'lease' whose termination, rather than restoring full ownership to the lessor, *extinguishes* whatever ownership had remained in the lessor during the lease term!" In *In re Harvey,* supra, 80 B.R. p. 538 this Court held that

> This lease compels the lessor to sell his own property. This concept of extinguishment of the ownership rights of the

lessor upon termination (whether or not the lessee exercises his option rights) is repugnant to the lessor's true ownership rights.... [T]he agreement requires the vehicle to be sold for the purpose of establishing the deficiency owed by the lessee and so as to assure the lessor the value of the vehicle plus accrued interest and penalties. This Court is hard pressed to imagine a true lease where the lessor is required to sell his property upon the termination of the lease.

In the cases now before this Court, no provision of the lease contracts requires FMCC to sell the leased vehicles after expiration of the lease term. Under these leases, FMCC is not *legally required* to extinguish its reversionary interest; so it cannot be said that these leases are inconsistent with true ownership as a *matter of law.* (What may happen to the reversion as a *matter of fact* will be discussed below.)

Thus far, it appears that these leases place all incidents of ownership in the lessee, but do not clearly establish an equity in the lessee nor extinguish the lessor's reversion as a matter of law. These contracts are like security agreements in some respects, unlike security agreements in other respects. This does not prove that they are leases; it only means that their true status remains, so far, unproven either way.

The final test is whether the transactions are economically equivalent with secured sales or loans—if so, they are to be treated as such. This test calls for evaluation of the real-world operation of these leases, including all the factors discussed so far, considered not separately but in combination, and ranging still further afield to consider the actual behavior of, and practical (not just legal or formal) constraints on, the parties. We have arrayed our facts, reconnoitered purchases option, skirmished over incidents of ownership, maneuvered in equities, feinted at reversion; now, at last, let battle be joined at the decisive point.

A fundamental "economic reality" is money. Under these leases, FMCC could expect to recover total rent plus option purchase price or sale proceeds approxi-

mating option purchase price or "residual value". In every case now before this Court, FMCC's total expected recovery exceeds the manufacturer's suggested retail price. FMCC as lessor in Vandiver could expect to recover $16,129.92 rent plus $6,318.00 option purchase price or residual value for a total of $22,447.92 over four years, an increase of 35% over the manufacturer's retail price of $16,626.00. FMCC as lessor in Thompson could expect to recover $8,413.92 rent plus $3,278.52 option purchase price for a total of $11,692.42 over four years, an increase of 39% over the manufacturer's retail price of $8,402.00. FMCC as lessor in Walkup could expect to recover $8,830.56 rent plus $4,462.24 option purchase price for a total of $13,292.80 over four years, an increase of 38% over the manufacturer's retail price of $9,696.00. FMCC as lessor in Clem could expect to recover $10,573.92 rent plus $4,113.70 option purchase price for a total of $14,687.62 over four years, an increase of 62% over the manufacturer's retail price of $9,093.00. FMCC as lessor in Ridenour could expect to recover $12,916.80 rent plus $6,117.52 option purchase price for a total of $19,034.32 over four years, an increase of 50% over the manufacturer's retail price of $12,652.66. FMCC as lessor in Allan could expect to recover $10,248.16 rent plus $4,919.00 option purchase price for a total of $15,167.16 over four years, an increase of 33% over the manufacturer's retail price of $11,440.00. FMCC as lessor in Ducummon could expect to recover $7,454.16 rent plus $3,204.47 option purchase price for a total of $10,659.55 over four years, an increase of 50% over the manufacturer's retail price of $7,121.05. FMCC as lessor in Collins could expect to recover $9,660.00 rent plus $5,900.00 option purchase price for a total of $15,660.00 over four years, an increase of 35% over the manufacturer's retail price of $11,545.00. FMCC as lessor in Knox could expect to recover $9,343.68 rent plus $4,718.54 option purchase price for a total of $14,062.22 over four years, an increase of 31% over the manufacturer's retail price of $10,757.90. These increases in total recovery over time are functionally equivalent to interest; and in this respect,

the operation of these "leases" is indistinguishable from payout of a secured credit sale or purchase-money loan over time.

If the option purchase is not exercised, the car would nevertheless be sold, despite the absence of an express requirement for sale in the lease contract. FMCC's lease manager testified that the vehicles were "usually" or "ordinarily" sold, transcript p. 30, because in the event of early termination, sale was "the only way to know if there was a difference between our investment in the vehicle and the vehicle's actual value," transcript p. 39, and after expiration of the full lease term "there just isn't a market of any substance for used vehicle leasing," transcript p. 30. The Court believes the stated fact, though it discounts the alleged reasons. Since the contract does not require sale of the vehicle and assessment of any deficiency beyond unpaid rent (a fixed sum) against the lessee, there is no real need to "know if there is a difference in our investment in the vehicle and the vehicle's actual value," transcript p. 29, and the statement that there is no market for rental of used cars is patently false—although it may well be that there is no market for leases *of this sort* of used cars. Nevertheless, it is obvious that FMCC will sell the cars, simply to recover their remaining value. FMCC is not interested in maintaining a fleet of used cars for hire; FMCC wants their remaining value, and specifically their *sale* value, not their *use* or "rent" value. So, FMCC promptly liquidates them. The practice is as regular and predictable as if it were specified in the contracts, although it is compelled by economic rather than legalistic considerations.

When the vehicles were sold, the amount recovered might sometimes be less, and sometimes more, than the option purchase price or residual value estimated years in advance of the actual sale. Thus, the "interest" amounts calculated above might or might not actually be realized upon sale at auction. From FMCC's point of view, a good contract would be one with a high monthly rent totaling at least as much as FMCC's acquisition cost, and a low residual value, as in Vandiver, Thompson, Clem,

Ridenour and Ducummon: after expiration of the full lease period, FMCC would already have recovered its investment in the vehicle plus perhaps a little more, and anything brought in on sale at auction would be gravy. If the vehicle's actual fair market value was high, such a contract could result in a large recovery by FMCC—as in Clem, Ridenour and Ducummon (if one assumes that option purchase price approximates actual fair market value). Less satisfactory from FMCC's point of view would be a contract with low monthly rent totaling significantly less than FMCC's acquisition cost, as in Walkup, Allan, Collins and Knox: this would reduce total profit, unless the difference were made up in downpayments and trade-ins or actual fair market value at auction sale was very high. To this extent, FMCC and not the lessees bore the risk of loss or expectancy of gain on sale of the vehicles. But if calculated residual value were anywhere near actual fair market value, FMCC would recover a total amount much greater than manufacturer's sale price and approaching the "interest" figures given above. If fair market value were drastically reduced because lessee turned in a junk heap, lessee would presumably be in breach and liable for a deficiency. It would seem that the risk of *serious* loss remained on the lessee, though FMCC assumed any expectancy of gain. Does this expectancy of gain indicate ownership, or does it merely indicate an opportunistic sort of usury?

As noted above, a true lease must have a true reversion in the lessor. In these cases, the leases do not legally require sale of the vehicles, and the vehicles retain some economic life beyond expiration of the lease periods—yet FMCC does not keep the vehicles to enjoy their remaining useful life, but sells them, either under the option purchases or, if the options are not exercised, at auction. Where rental payments are lowest, and FMCC's risk of loss is greatest, liquidation of the vehicles would seem to be most urgent. As a matter of fact, FMCC neither has nor wants any meaningful reversionary interest in these vehicles. FMCC is determined to sell them,

quickly, to the former lessees or to anyone else who will buy them. Since there is no market of interest to FMCC for lease of used vehicles, the initial lease effectively commits FMCC to sale of the vehicle as soon as the initial lease ends. This is true whether the lease be for 4 years or only 1 year—a car, once leased, is as good as sold.

There can be no lease without a reversion; and if the lease is to be real, the reversion must be real. Here, there is a legal semblance of a reversion, made to appear simply by deleting from the lease contracts any express requirement or acknowledgement that the vehicles will be sold after the expiration of the lease term. But the semblance is without substance—it lacks economic reality. In economic reality, there is no reversion; the fact that FMCC sells the vehicles as a matter of course despite the lack of legal compulsion to do so only emphasizes the compelling economic reality. The vehicles are sold to complete FMCC's recovery of their original sale value plus additional moneys comparable to interest. FMCC is committed to this course of action from the inception of the transaction. From FMCC's point of view, the effect, and surely the purpose, of the transaction is to acquire money equivalent to sale price plus interest, retaining some rights in the vehicle only long enough to insure payment of these amounts. From FMCC's point of view, such a transaction is equivalent to a secured credit sale or purchase money loan, and is so from the inception of the "lease." In essence, FMCC asks this Court to treat all these transactions as true leases only because, *if* the option purchase is not exercised, the final sale of the vehicle may be to a different buyer than the original "lessee."

Even if the option purchase is not exercised (e.g. because the option purchase price or residual value proves unrealistically high) the original lessee may appear at the auction sale and buy the car there, where its actual market value can be established by bidding. Where this is not done, and the vehicle is sold at auction to a third party, the transaction as a whole might be described as a "sale to two, successive owners." This seems outre, yet becomes quite commonsensical if the transaction is viewed as a whole and in context, disregarding the artificial terminology of the "lease" and describing the facts as they appear. FMCC offers two different methods of buying a car. One method emphasizes payment by sizeable installments, which amount up the entire value of the car plus interest over several years. The other method involves somewhat smaller installment payments, making up the difference with a "balloon" payment at the end of the contract term. In both methods, the buyer bears all the significant burdens of ownership from the moment he signs the agreement and drives the car off the lot. In both methods, full payment of purchase price plus interest is secured by the vehicle purchased. In the first method (payout by simple installments), payment is loaded "at the front end" of the term; the security interest becomes less and less important as the contract period nears its end and the balance due becomes minimal, approaching zero. In the second method (involving a large final or "balloon" payment), payment is shifted "toward the back end" of the period, entailing some extra measures—use covenants, reconditioning fees, insurance—to keep up the value of the collateral as time goes on. In the second method, the purchaser may make his final "balloon" payment in cash, freeing his car from FMCC's security interest at last. Or he may finance the final "balloon" payment by re-selling the car to another buyer, with the secured creditor as his auction agent. The parties agree that, if the car is in good condition at term end and is auctioned, FMCC will take whatever it brings. In effect, the buyer waives his right to profits over fixed purchase price plus fixed interest if FMCC waives its right to a deficiency under fixed purchase price plus fixed interest. The amount recovered on auction may differ somewhat from the lessee's option purchase price, but every effort is made to minimize the difference. On occasion, FMCC may make a large profit; but this does not differ in effect from a sale or loan at an unusually high interest rate. On occasion, FMCC will experience a loss; but

secured sales under the pure installment method sometimes go bad, too; and FMCC can guard against such losses by confining the "balloon" method to creditworthy customers, carefully balancing the size of the final "balloon" payment against the expected minimum fair market value of the collateral at term end, encouraging good maintenance of the collateral, and requiring deposits and insurance—all of which FMCC in fact does. FMCC chooses to label the second method a "lease." This enables FMCC to cheat its customers out of basic warranties, while both FMCC and its customers cheat the Government out of its taxes. The fact remains that the so-called "lease" is merely a variant form of secured credit sale or purchase money loan. FMCC's title to the vehicle is merely an incident to this security device.

FMCC's promotional literature reinforces these conclusions. The brochures offer leasing as an alternative form of purchase or financing—a way of accomplishing the substantial equivalent of trade-in-and-repurchase at frequent intervals, desirable for those car buyers who want new cars and deductible payments more than ownership of old cars free and clear—in short, an "old-fashioned" *car purchase* with trendy rearrangement of a few "details." The promotional literature's statements that rental payments are merely for use and have nothing to do with "the price of the car" are not accurate. The promotional literature's statements that rental payments must or will usually be much lower than ordinary installment payments are unreliable. The promotional literature's statements that lease warranties are equivalent to purchase warranties are contradicted by the leases themselves—but, even if market pressures cause FMCC to provide lease warranties similar to purchase warranties, this only increases the transaction's overall resemblance to sale. The promotional literature makes it clear that lease-end sale of vehicles is carried out by FMCC as the customers' auction agent, and represents a final payout rather than a reversion of ownership. The customers must turn in their cars (if they do not pay off the remaining amount themselves un-

der the "purchase option"); but the customers agree to do this at the inception of the agreement, and the entire transaction is designed for use by car owners who normally do this anyway—even after they have unequivocally purchased cars and paid for them!

In short, the transactions governed by these lease forms are secured credit sales or purchase-money loans, tailored to fit car and truck buyers who prefer to trade in their vehicles after a few years, pay off a large part of the sale price and finance charges at that time in a single large "balloon" payment, and acquire brand-new vehicles. The "lease" form contracts themselves are merely a cover, a charade, a sham—a lie.

In *In re Cole: Woodson, Trustee v. Ford Motor Credit Co.,* Covey, J., 100 B.R. 561 (1989), the Court held that a lease entered into on March 20, 1986 between debtor Cole and "Family Ford L/M of Pryor, Inc." and immediately assigned to FMCC, was a true lease and not a security agreement. Exactly which lease form was used does not appear, but the date of March 30, 1986 and the lease terms mentioned in the opinion indicate that the form was one of the same two forms now considered by this Court or substantially similar thereto. In *In re Cole,* the Court held that the agreement amounted to a true lease, because (1) the lessee could and likely would decline to exercise the purchase option; (2) FMCC was given a "meaningful residual interest" in the vehicle, *id.,* pp. 563–64; (3) the lessee's payment obligation was "inconsistent with a sales transaction" *id.,* pp. 564–65; and (4) the lease's mileage charge and repair requirements were "inconsistent with the obligations of a purchaser," *id.,* p. 565.

In *In re Cole,* the Court treated "residual value" as if it must always be equal to or greater than actual fair market value. In so doing, the Court overlooked the lessor's incentive and ability to reduce residual value below estimated fair market value, making up the difference in higher monthly payments, subject to no limitations but the customer's unwillingness to pay. The Court also overlooked the possibility that

the lessee would decline to exercise the purchase option but might nevertheless appear and bid for the car at auction sale. As a result, the Court perhaps exaggerated the unattractiveness of the lessee's options at the end of the lease term.

▮ As noted above, a true lease must have a reversion. In *Cooper, Identifying a Personal Property Lease Under the UCC*, Ohio St.L.J. 195, 204 and n. 31, an article cited by *In re Cole*, supra, p. 564 n. 6, it is admitted that residual value "... is not meant to be synonymous with the reversionary interest which returns to a lessor upon completion of the lease term." When looking for a lease, one should look for elements of a lease, and not for other things. Since a reversion typifies a lease, one would look for a reversion, and not for something else. *Cooper* never explains why something that is not a reversion should have any bearing on the presence or absence of a lease; nor does any reason occur to this Court why any weight should be placed on such an extraneous factor. Moreover, in its attention to the lessee's economic freedom to decline the purchase option, *In re Cole* did not consider the lessor's economic compulsion to sell the goods in any event, thus extinguishing its own reversion. In *In re Cole* there may be a meaningful residual value, but there is no meaningful reversion. A "residual value" is not easily distinguished from a mere right to receive a final "balloon" payment, and thus is not a clear and reliable indicator of the existence of a lease. This Court prefers to look for a real reversion, and in these cases has found none.

In *In re Cole*, the Court found that the manufacturer's suggested retail price of the vehicle therein was $13,310.40 and that payments were $293.59 per month for 48 months, whose total is not stated but appears to this Court to amount to $14,092.32. It is not clear whether the $293.59 per month was all "rent" or was mostly "rent" but partly "use or rental tax;" if the latter was included, the total "rent" paid over four years would be slightly less than $14,092.32. In *In re Cole*, the Court further determined that "assuming a 12% discount factor, the present value of the payments Debtor was obligated to make was roughly $11,150.00 ... Therefore, under the Agreement Debtor was obligated to pay consideration with a present value of approximately 84% of the fair market value of the vehicle, which payment obligation is inconsistent with a sales transaction," *id.*, p. 565. It is not clear why a discount rate of 12% was used, nor what figure was discounted. The total "obligation" of lessee if the purchase option were exercised would be $14,092.32 monthly payments plus $4,710.97 option purchase price for a total of $18,803.29; using a standard table of present values at compound interest listing a discount factor for 12% over four years of 0.636, this Court arrives at a present value of $11,958.89 rather than $11,150.00. However, the larger amount should perhaps be reduced to account for included "use or rental tax," so the result would not differ much from that determined in *In re Cole*. But this assumes that the total sum of $18,803.29 would be paid in a single great "balloon" payment of $18,803.29 at the end of four years. But such a present value analysis must be based on the assumption that payment of the *entire* $18,803.29 will be deferred for four years and paid off in a single huge "balloon" payment at the last. In fact, in these contracts payments begin immediately and continue over the entire lease period, providing the lessee with a substantially greater return and invalidating such a present-value analysis. When the contract is considered prospectively, it appears that FMCC as lessor in the Cole lease could expect to recover almost $14,092.32 rent plus $4,710.97 option purchase price for a total of $18,803.29 over four years, an increase of 41% over the manufacturer's retail price of $13,310.40. Thus, if the purchase option were exercised, Cole would pay the full purchase price of the car plus about 40% over four years—which appears to be perfectly consistent with a sales transaction.

In *In re Cole*, the Court found excess mileage fees and requirements for repairs for damage not resulting from ordinary wear to be "inconsistent with the obli-

gations of a purchaser," *id.,* p. 565. Yet it appears from evidence before this Court that the lessees and FMCC themselves never expected the excess mileage provision to operate, since it took effect only for miles driven over 60,000 miles and this was agreed to be the maximum number of miles the car was expected to be driven. No reason appears why much weight should be given to a non-operative provision. Moreover, in *Tulsa Port* and *In re Breece,* excess mileage provisions were held to be anomalous and insufficient of themselves to indicate true lease status when weighed against other factors indicating a secured transaction. Of course, an owner would normally bear the burden of repairing his own car; calling this burden a "requirement" does not transform the owner into a mere lessee. Moreover, covenants for protection and maintenance of collateral are common enough in security agreements, and are to be expected where, as here, the value of collateral must be kept up to secure a large "balloon" payment at term end. Under all the circumstances, this Court concludes that the excess mileage and repair provisions are consistent with security agreements securing "balloon" notes.

For these reasons, this Court respectfully declines to follow *In re Cole.*

This Court concludes that the "leases" herein are, in economic reality, merely a type of secured transaction. As transactions granting security interests, they must be treated as such. Accordingly, these security interests, if unperfected, are inferior to the Trustee's rights under 11 U.S.C. § 544(a), 12A O.S.A. § 9–301(1)(b).

In Oklahoma, a security interest in a motor vehicle is perfected solely by delivery of a lien entry form to the Oklahoma Tax Commission or to its motor license agent, 47 O.S.A. (1989) Supp. § 1110(A)(1). In all of the cases now before this Court, FMCC never delivered any lien entry forms to the Oklahoma Tax Commission or its agents, and is therefore unperfected and inferior in right to the Trustee—with one possible exception.

The possible exception is the Clem case, wherein the vehicle was purchased from a Texas car dealer who appears as "Owner (If Lien Recorded)" on the Texas Certificate of Title, with FMCC listed on the face of said title as "Lien Holder (Or Owner If No Lien)." The Court is not informed as to whether such notation constituted original perfection under Texas law, and whether or when any such perfection might have lapsed after removal of the vehicle from Texas to Oklahoma. In this case, the Court cannot determine whether or not FMCC is unperfected, and so cannot hold at this time that the Trustee's interest is superior to FMCC's. See *In re B & S Motor Freight, Inc.: Woodson v. Community Bank & Trust Company,* 59 B.R. 259 (B.C., N.D.Okla.1986).

IT IS THEREFORE ORDERED, in the cases of Thompson, Vandiver, Walkup, Allan, Ridenour, Ducummon, Collins and Knox, that the Trustee's complaint be, and the same is hereby, GRANTED; the Trustee shall retain the proceeds of the sale of the vehicles in said cases for the benefit of the respective estates in bankruptcy.

IT IS FURTHER ORDERED, in the case of Clem, that the Trustee's complaint be DENIED, unless, within fifteen (15) days after the date of this Order, the Trustee files a written request for further hearing on the matter, with brief attached or included.

IT IS FURTHER ORDERED that judgments be entered accordingly.