In Re Charles E. COLE, Debtor.

Fred W. WOODSON, Trustee, Plaintiff,

v.

FORD MOTOR CREDIT COMPANY, Defendant.

Bankruptcy No. 88–02921–C.

Adv. No. 89–0033–C.

United States Bankruptcy Court, N.D. Oklahoma.

May 16, 1989.

James W. Keeley, Tulsa, Okl., for plaintiff.

Thomas G. Marsh, Tulsa, Okl., for defendant.

## MEMORANDUM DECISION AND ORDER

STEPHEN J. COVEY, Bankruptcy Judge.

This matter is before the Court on the motions for summary judgment of the Trustee and Ford Motor Credit Company ("Ford Credit") on the Trustee's Complaint to avoid the interest of Ford Credit in a 1986 Ford motor vehicle ("Vehicle"). The Court finds that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). After considering the evidence and the arguments and authorities of counsel, the Court makes the following findings of fact and conclusions of law.

On March 20, 1986, Debtor and Family Ford L/M of Pryor, Inc., ("Family Ford") entered into an agreement ("Agreement") entitled "Net (Closed End) Lease". Under the Agreement, Debtor agreed to lease the Vehicle from Family Ford for a term of 48 months. Family Ford immediately assigned the Agreement to Ford Credit in exchange for the payment of $9,789.30.[1] Title to the Vehicle was registered and remained in the name of Ford Credit. On September 28, 1988, Debtor filed his voluntary petition for relief in this case.

The sole issue before the Court is whether the Agreement creates a lease or a security interest. The Trustee alleges that the Agreement merely creates a disguised security interest, which Ford Credit has failed to perfect and which the Trustee may avoid under 11 U.S.C. § 544. Ford Credit contends that the Agreement is a true lease and its ownership interest in the Vehicle cannot be avoided by the Trustee. The parties have stipulated to the relevant facts and testimony.

Under the Agreement, Debtor had various obligations and responsibilities. Debtor was required to make monthly payments of $293.59 during the 48 month term of the Agreement. Debtor was responsible for maintaining and repairing the Vehicle.

Debtor was required to obtain fire, theft, collision, and liability insurance and to indemnify Ford Credit from any damage or loss to the Vehicle or from claims arising out of the use of the Vehicle. Debtor was also responsible for paying all taxes and the registration and license fees on the Vehicle.

At the end of the 48 month term, Debtor had the option to purchase the Vehicle for $4,710.97 or to return the Vehicle without further obligation, except for excess mileage and wear and tear charges, if applicable. The purchase option price was calculated, at the time the parties entered into the Agreement, to be equal to or greater than the estimated fair market value of the Vehicle at the end of the 48 month term of the Agreement. Such fair market value was estimated based on historical trends in the used car market and other market trends.

In the event of default, Ford Credit could terminate the Agreement, repossess and sell the Vehicle. In such event, Debtor's liability for the remaining payments and any other amounts owing under the Agreement would be accelerated. Also, Debtor would become liable for the costs of Ford Credit in repossessing and selling the Vehicle. Following sale of the Vehicle, Ford Credit would apply the proceeds first against the amount Ford Credit "would have had invested in the Vehicle" and then against any remaining amounts owed under the Agreement.

When the parties entered into the Agreement, the Oklahoma statute defining "security interest", 12A O.S.1981 § 1–201(37), stated in pertinent part, as follows:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal

---

1. The manufacturer's suggested retail price of the Vehicle at the time of the Agreement was $13,310.40.

consideration does make the lease one intended for security.

The Court is not aware of any Oklahoma state court decisions construing this provision, but several federal courts in Oklahoma, including this one, and the Tenth Circuit Court of Appeals have written opinions interpreting the statute. See *Percival Construction Co. v. Miller & Miller Auctioneers, Inc.*, 387 F.Supp. 882 (W.D.Okl. 1973), aff'd 532 F.2d 166 (10th Cir.1976); *Citicorp Leasing Corp. v. Allied Institutional Distrib., Inc.*, 454 F.Supp. 511 (W.D. Okl.1977); *In re Fashion Optical, Ltd.*, 653 F.2d 1385 (10th Cir.1981); *In re Tulsa Port Warehouse Company, Inc.*, 690 F.2d 809 (10th Cir.1982); *In re Tucker*, 34 B.R. 257 (Bankr.W.D.Okl.1983); *Equico Lessors, Inc. v. Wetsel*, 576 F.Supp. 13 (W.D. Okl.1983); *In re Breece*, 58 B.R. 379 (Bankr.N.D.Okl.1986); *In re Harvey*, 80 B.R. 533 (Bankr.N.D.Okl.1987). While these decisions have given guidance to the Court, each case must be decided on the provisions of the agreement under consideration and in light of the other relevant facts and circumstances.

In 1988, the Oklahoma legislature amended 12A O.S. § 1–201(37) by adding guidelines to aid courts in distinguishing true leases from secured sales.[2] The amendment does not make a substantive change in the law, but serves to clarify an area which has proved confusing to the courts.[3]

Under subsection (b) of the amended statute, the Agreement would create a security interest automatically if Debtor could not unilaterally terminate the Agreement and any one of four other tests listed is met. These four other tests are as follows: (i) the term of the "lease" is equal to or greater than the remaining economic life of the goods; (ii) the "lessee" is required to become the owner of the goods or renew the lease for the remaining economic life of the goods; (iii) the "lessee" has an option to renew the lease for the remaining economic life of the goods for no or nominal additional consideration; (iv) the "lessee" has an option to become the owner of the goods for no or nominal additional consideration. In this case, Debtor could not unilaterally terminate the Agreement. However, none of the other four tests is met because (1) the term of the Agreement is less than the economic life of the Vehicle[4], (2) Debtor is neither required to renew nor has an option to renew the Agreement, and (3) Debtor's option to purchase the Vehicle is for greater than nominal consideration since the option price was a fixed price equal to or greater than the reasonably predictable fair market value of the Vehicle at the end of the Agreement.[5]

2. After several years of study and drafting, the National Conference of Commissioners on Uniform State Laws and the American Law Institute approved the revised § 1–201(37) along with *Article 2A of the Uniform Commercial Code* governing leases of personal property. After further study, the Uniform Laws Committee of the Oklahoma Bar Association recommended to the Oklahoma legislature the passage of the proposed Article 2A and conforming amendments, including revised § 1–201(37). The Oklahoma legislature and the Governor approved passage of the law and it became effective as of November 1, 1988.

3. The amendment does make one significant change—it deletes any reference to the "intent" of the parties. As explained in the Official Comment to the section, the reason for the change was that most of the criteria courts relied on to show intent were as consistent with true leases as with security interests. While this change is significant, the Court does not believe that it is substantive. In other words, it was not the

intent of the drafters to alter the true nature of a lease or security interest through passage of the amendment, but merely to clarify the distinction between the two.

4. There was no direct evidence on the economic life of the Vehicle. However the Court can infer from the purchase option price of $4,710.97, which also represents the estimated fair market value of the Vehicle at the end of four years, that the Vehicle was designed to have an economic life greater than four years. Further, the Court notes from general experience that motor vehicles have useful economic lives exceeding four years.

5. The Court notes that the fixed price option does not fall within either the definition of "nominal" nor the definition of "not nominal" under subsection (d)(i)(B). However, under subsection (c)(v), the Court cannot find that the Agreement creates a security interest merely because of the fixed price option. The only reasonable construction of the statute is that,

Under subsection (c), the amended statute provides additional guidance by listing factors whose mere presence does not necessarily indicate a security interest because they are consistent with either a lease or a security interest. These factors are as follows: (i) the present value of the "lessee's" payment obligation is substantially equal to or greater than the fair market value of the goods; (ii) the "lessee" assumes the risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs; (iii) the "lessee" has an option to renew the lease or become the owner of the goods; (iv) the "lessee" has an option to renew the lease for rent that is equal to or greater than the reasonably predictable fair market value of the goods at the time of the option; (v) the "lessee" has an option to purchase the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods. To the extent these factors are present in this case, the Court cannot consider their presence determinative.

The essential difference between a lease and a security interest can be gleaned from a closer examination of subsection (b). In each situation where a security interest is deemed to exist under subsection (b), the "lessor" cannot reasonably expect to receive back anything of value at the end of the lease. Either the goods will have reached the end of their economic life or the "lessee" will be compelled, contractually or economically, to purchase the goods or renew the "lease" to the end of the economic life of the goods. Commentators have labelled this key factor distinguishing a lease from a security interest as the lessor's retention of a "meaningful residual interest".[6]

In this case, the Court finds that Ford Credit has retained a meaningful residual interest in the Vehicle with a value of approximately $4,710.97, and the Agreement is therefore construed to be a lease. Although Debtor has an option to purchase the Vehicle, it is not a foregone conclusion that Debtor will exercise the option. Since the option price is the reasonably predictable fair market value of the Vehicle at the end of the term, no economic incentive compels Debtor to purchase the Vehicle—unless Ford Credit grossly underestimated the fair market value of the Vehicle.[7] Debtor's exercise of the option would depend only on whether the Vehicle continued to suit Debtor's needs and preferences.

Furthermore, several provisions in the Agreement are designed specifically to protect Ford Credit's residual interest in the Vehicle. The Agreement limits the number of miles Debtor can drive the Vehicle, without extra charge, and also charges Debtor for any repairs not resulting from "normal wear and tear" at the end of the Agreement. These provisions ensure the good condition of the Vehicle at the end of the Agreement. Furthermore, in the event of default, the Vehicle is sold and the proceeds first applied to "what [Ford Credit] would have had invested in the Vehicle at the end of the lease term". This amount is precisely the value of Ford Credit's residual interest in the Vehicle, or $4,710.97. *Keeling v. Ford Motor Credit Company*, 550 A.2d 932, 314 Md. 311 (1988). Thus, the default provision protects Ford Credit's residual interest in the Vehicle by ensuring that sale proceeds are first applied against this amount and then to the remaining lease payments and other amounts owing under the Agreement.

---

where an agreement contains a fixed price option equal to or greater than reasonably predictable fair market value, such fixed option price cannot be construed as nominal additional consideration under subsection (b)(iv); otherwise, subsection (c)(v) would be rendered meaningless.

6. See generally Huddleson, *Old Wine in New Bottles: UCC Article 2A—Leases*, 39 Ala.L.Rev. 615 (1988); Cooper, *Identifying a Personal Property Lease Under the UCC*, Ohio St.L.J. 195

(1988); Strauss, *UCC Article 2A: Leases*, in Equipment Leasing 1988 (Practicing Law Inst. 1988); and Harris, *Recent Cases Relating to Equipment Leasing*, in Basics of Equipment Leasing 1987 (Practicing Law Inst.1987).

7. Given the predictable nature of used car sales and the relative stability of the current economy, the Court believes there is little possibility of gross error in calculating the fair market value of the Vehicle after four years.

Another factor possibly distinguishing a lease from a disguised sale is the "lessee's" payment obligation. In a typical arms-length sale of goods, the buyer has a contractual obligation to pay the seller consideration with a present value approximating the fair market value of the goods at the time of sale. Where the present value of lease payments, and any other consideration or obligation under the lease, is *significantly less* than such fair market value, the transaction is probably a lease because the payment obligation is inconsistent with a buyer's obligation in a sale.[8] In this case, assuming a 12% discount factor, the present value of the payments Debtor was obligated to make was roughly $11,150.00. The manufacturer's suggested retail price for the Vehicle, an amount reasonably approximating its fair market value, was $13,310.40. Therefore, under the Agreement, Debtor was obligated to pay consideration with a present value of approximately 84% of the fair market value of the Vehicle, which payment obligation is inconsistent with a sales transaction.

In addition to the payment obligation, the Agreement contains other obligations or restrictions on Debtor which are inconsistent with the obligations of a purchaser. For example, the limitation on the mileage Debtor can drive without extra charge and the requirement that Debtor make repairs to the Vehicle for damage not resulting from normal wear and tear. In a true sales transaction, Debtor would have complete freedom to drive the Vehicle and to decide whether to make repairs.[9]

For the reasons stated above, the Court finds that the Agreement is a true lease and does not create a security interest. Therefore, the Trustee cannot avoid the interest of Ford Credit in the Vehicle under 11 U.S.C. § 544.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the Trustee's Complaint to avoid the interest of Ford Credit in the Vehicle be and hereby is denied on the grounds that the Agreement between Ford Credit and Debtor is a true lease.

---

**8.** However, under subsection (c)(i), an agreement does not create security interest merely because the present value of the consideration lessee is obligated to pay *is* substantially equal to or greater than the fair market value. Such a payment obligation is consistent with a sale, but not necessarily inconsistent with a lease.

**9.** The Court recognizes that these contractual restrictions would not be significant unless Ford Credit retained a meaningful residual interest in the first place—for example, if it were a foregone conclusion that Debtor would purchase the Vehicle rather than return it, the mileage and wear and tear provisions would, as a practical matter, be unenforceable.