In re Timothy L. THUMMEL and Mary V. Thummel, Debtors.

Scott P. KIRTLEY, Trustee, Plaintiff,

v.

GENERAL MOTORS ACCEPTANCE CORPORATION and Timothy L. and Mary V. Thummel, Defendants.

Bankruptcy No. 88–02859–C.

Adv. No. 88–0301–C.

United States Bankruptcy Court, N.D. Oklahoma.

Dec. 26, 1989.

Scott P. Kirtley, Tulsa, Okl., for plaintiff.

Brian Rayment, Tulsa, Okl., for GMAC.

Warren G. Morris, Tulsa, Okl., for Thummel.

## MEMORANDUM DECISION AND ORDER

STEPHEN J. COVEY, District Judge.

The Trustee has brought this adversary proceeding against General Motors Acceptance Corporation ("GMAC") and Timothy and Mary Thummel ("Debtors") to avoid the interest of GMAC in a motor vehicle and for additional relief. After considering the evidence and the arguments and authorities of counsel, the Court makes the following findings of fact and conclusions of law:

On May 30, 1986, Debtors entered into an agreement with GMAC whereby GMAC purported to lease a 1986 Toyota pickup ("Vehicle") to Debtors. The agreement is entitled "Lease Agreement" and is also marked "GMAC Direct Leasing Plan" at the top of the agreement. A copy of the agreement ("Agreement") is appended to this decision. On or about May 30, 1986, GMAC obtained a certificate of title from the State of Oklahoma listing GMAC as owner of the Vehicle, but not indicating that the Vehicle was subject to any liens. On September 6, 1988, GMAC delivered a lien entry form to the Oklahoma Tax Commission and a new certificate of title was issued listing GMAC as owner of the Vehicle and as a lienholder. On September 23, 1988, Debtors filed this case for relief under Chapter 7 of the Bankruptcy Code.

The parties have raised two principal issues. First, whether the Agreement constitutes a true lease or merely creates a security interest. Second, if the Agreement merely creates a security interest, whether GMAC has perfected this security interest under Oklahoma law.

In *In re Cole*, 100 B.R. 561 (Bankr. N.D.Okl.1989), the Court set forth its interpretation of Oklahoma law governing the distinction between leases and security interests. First, the Court applies amended 12A O.S. § 1–201(37)(b) to determine if a purported lease agreement must automatically be deemed a security interest.[1] This occurs if the "lessee" cannot unilaterally terminate the agreement and any one of four other tests listed is met. In this case, if Debtors were not already in default, they were entitled to unilaterally terminate the Agreement at any time upon 15 days written notice to GMAC, subject to an early termination liability computed under paragraph 14 of the Agreement. Because Debtors could unilaterally terminate the Agreement, the Agreement cannot be automatically deemed to create a security interest under amended § 1–201(37)(b).

Next, under § 1–201(37)(c), the Court disregards the presence of certain enumerated factors because such factors by themselves are deemed to be as consistent with a lease as with a security interest transaction. *Cole* at 564.

Finally, the Court examines whether the lessor has retained a "meaningful residual interest" in the vehicle, which is the fundamental characteristic distinguishing a lease from a security interest. *Cole* at 564. For the reasons set forth below, the Court finds that GMAC has retained a "meaningful residual interest" in the Vehicle under the Agreement, and, therefore, the Agreement constitutes a true lease. In reaching this decision, the Court respectfully declines to follow the decisions of Judge Wilson in *In re Harvey*, 80 B.R. 533 (Bankr.N.D.Okl.1987), construing an identical GMAC "lease agreement" as creating a security interest, and *In re Thompson*, 101

---

1. The Court applies amended § 1–201(37) in construing leases entered into prior to the effective date of the amendment (November 1, 1988) because the amendment clarifies prior law rather than substantively changing it. *Cole* at 563. The amended statute does eliminate any reference to the "intent" of the parties, because most of the criteria courts used to determine intent were as consistent with leases as with security interests. *Id.* As stated in the Oklahoma Commentary, the remainder of amended § 1–201(37) "codifies the better case law construing the former provision so as to provide additional statutory guidance as to the relevant considerations in making the determination of whether a lease instead is a security interest". *Commentary on Uniform Commercial Code Article 2A as Enacted in Oklahoma,* Fred H. Miller.

B.R. 658 (Bankr.N.D.1989), which construed a similar Ford Motor Credit Company lease agreement as creating a security interest.

Under the Agreement, Debtors purported to lease the Vehicle for 48 months with an option to terminate the Agreement prior to that time. At the end of the 48 month period, one of two things could occur. First, under paragraph 20, Debtors could return the Vehicle to GMAC and Debtors would be liable to pay "any amounts" owing under the Agreement. The Court construes such amounts to include excess mileage charges and damages from excess wear and tear, applicable only if Debtors did not comply with the terms of the Agreement governing these items. Not included are liabilities computed under paragraph 14 entitled "Early Termination and Default".[2] Thus, at scheduled termination, if Debtors complied with the terms of the Agreement, they would be free to return the Vehicle to GMAC and "walk away" without further liability. The Court finds the existence of this option, if it is viable, to be consistent with a lease transaction and inconsistent with a security interest transaction.

The Court now examines whether the Debtors' option to purchase the Vehicle at scheduled termination in effect eliminates the Debtors' option to return the Vehicle. At scheduled termination, Debtors had the option to purchase the Vehicle for its "Fair Market Value", defined as "the average of the retail and wholesale values stated in a then current vehicle guidebook selected by Lessor". The Court takes judicial notice that such vehicle guidebooks exist and are commonly used to determine the approximate value of used cars. Furthermore, given the predictable nature of used car sales and the volume of information regarding trends in this area, the values stated in current vehicle guidebooks should reasonably approximate the actual fair market value of the average vehicle. The Court also takes judicial notice that, at the end of 48 months, the Vehicle would have a considerable remaining economic life and, therefore, a substantial fair market value. As evidence of this, the Agreement itself sets forth the Vehicle's "residual value", which is the estimated fair market value of the Vehicle at scheduled termination, as $3,047.46. Therefore, the Court finds that, although Debtors had the option to purchase the Vehicle, it is not a foregone conclusion that they would exercise the option. No economic incentive would compel Debtors to exercise the purchase option.[3] Rather, Debtors' exercise of the purchase option would rest on whether the Vehicle continued to suit the Debtors' needs and preferences. See *Cole* at 564 and *Harvey* at 538. Under these circumstances, Debtors' option to return the Vehicle and walk away without further liability is certainly a viable option.

In summary, at scheduled termination, if Debtors complied with the terms of the Agreement, they would have the option to (1) return the Vehicle to GMAC without further liability, or (2) purchase the Vehicle at a price closely approximating the actual fair market value of the Vehicle. Under these circumstances, at scheduled termination, GMAC clearly retains a meaningful residual interest in the Vehicle since there is as much chance that Debtors would return the Vehicle and walk away without further liability as there is a chance that Debtors would exercise their option to purchase the Vehicle. *Cole* at 564.

Provided they are not in default, Debtors also have the option to terminate the Agreement at any time prior to scheduled

---

**2.** In *Harvey,* Judge Wilson apparently construed the provisions of paragraph 14 to apply both on early termination and scheduled termination. This Court disagrees with this construction. All provisions of paragraph 14 clearly and unambiguously apply on early termination only.

**3.** The Court recognizes that if Debtors maintained the Vehicle in superb condition, over and above the standards contained in the agreement itself, the Vehicle could be worth more that at the end of the agreement than the "Fair Market Value" as established by industry guidebooks. Nonetheless, the Court does not believe that Debtors could maintain their vehicle in such better condition that they would be economically compelled to purchase the Vehicle at scheduled termination of the Agreement.

termination upon 15 days written notice to GMAC. In the event of early termination, one of two things could occur. First, under paragraph 14, Debtors could return the Vehicle to GMAC. GMAC would then sell it in a commercially reasonable manner and apply the proceeds against the amounts owing on early termination as fixed by a formula set forth in paragraph 14(c)(i). Second, under paragraph 10, Debtors could exercise their option to purchase the Vehicle for the greater of its "Fair Market Value" or the amount owing on early termination under paragraph 14(c)(i). In either case, it is clear that GMAC would not receive back the Vehicle, but a sum of money instead.[4] The issue is whether GMAC continues to retain a meaningful residual interest in the Vehicle given the early termination option.

The Court finds that the early termination option does not destroy GMAC's meaningful residual interest in the Vehicle, but operates as a sort of liquidated damages clause designed primarily to protect the benefit of GMAC's bargain as if the Agreement were performed to its scheduled termination.[5] Using the analysis set forth above, the Court finds that it is not a foregone conclusion that Debtors would exercise the option to purchase the Vehicle on early termination, because the option price would at least closely approximate the actual fair market value of the Vehicle. Rather, it is just as likely that Debtors would return the Vehicle to GMAC, and, therefore, become liable for the amount set out in paragraph 14(c)(i). Under paragraph 14(c)(i), GMAC is assured of receiving the benefit of its bargain as if the Agreement were performed to scheduled termination. Under this paragraph, Debtors are liable for past due rent, if any, and all unmatured rent, just as if the Agreement had extended to its full term. In addition, Debtors must pay "additional amounts owed", such as excess mileage or wear and tear charges. In addition, Debtor's are liable

for the Vehicle's "residual value" of $3,047.46, which is the estimated fair market value of the Vehicle at scheduled termination (while this is not exactly what GMAC bargained for at scheduled termination—GMAC bargained for the Vehicle itself or a price established by *current* industry guidebooks—it is the closest possible approximation as of the date of the Agreement). From this amount owing for rent, additional charges and the residual value, "unearned charges" are then subtracted. The "unearned charges" function as a sort of a rebate or adjustment against the Debtor's liability. The rebate or adjustment makes sense because otherwise, under paragraph 14(c)(i), GMAC would receive the full benefit of its bargain—48 months rent plus the value of the vehicle at the end of 48 months—ahead of schedule, thereby in effect receiving more than it bargained for. Finally, in addition to this total amount, Debtors must pay a charge of $600.00 if termination occurs during the first 12 months, $400.00 if termination occurs during the next 12 months, and $200 if termination occurs during the next 12 months. This charge appears to be a penalty designed primarily to discourage early termination.

Other aspects of the Agreement support the Court's finding that GMAC retains a meaningful residual interest in the Vehicle. For example, the Agreement imposes restrictions on mileage and requires Debtors to maintain the Vehicle in "good condition" as carefully set forth in the Agreement. These conditions are designed to ensure the GMAC's residual interest in the Vehicle is protected and, therefore, "meaningful". The Court also notes that these conditions are inconsistent with the rights of a buyer in a typical vehicle purchase situation. See *Cole* at 565.

In summary, the Court finds that GMAC retains a meaningful residual interest in the Vehicle under the Agreement, and,

---

**4.** GMAC would receive at least the Fair Market Value of the vehicle or the amount owing on early termination and at most the actual sale proceeds of the vehicle (if the sale proceeds exceeded the early termination liability).

**5.** Whether the liquidated damages aspect of the provision is legally valid is an issue not before the Court at this time.

therefore, the Agreement constitutes a true lease.

In addition, the Court finds that the Debtors' payment obligation under the Agreement is inconsistent with a secured sale transaction. See *Cole* at 565. In a secured sale transaction, Debtors would have been obligated to pay approximately the present value of the Vehicle's fair market value (in addition to sales tax and license and registration fees). Assuming a 12% discount rate, which the Court finds to be reasonable, the present value of Debtors' payment obligation (not including sales tax and license and registration fees) was approximately $4,817.76.[6] While there was no direct evidence on the fair market value of the Vehicle, the Court finds that it would be at least somewhere between the "factory delivery price" of $6,298.00 and the "total delivery price" of $7,550.00. Thus, Debtors' payment obligation was significantly less than the payment obligation of a typical buyer in a sales transaction.

For all the reasons stated above, the Court finds that the Agreement constitutes a true lease and does not create a security interest. Normally, the Court's conclusion on this issue would make it unnecessary to address the second issue regarding whether or not GMAC can be deemed to have perfected a security interest in the Vehicle. However, due to the divergence of opinion in this area of the law, the Court feels that it would be useful to briefly address this second issue. For the purposes of this discussion, which is admittedly dicta, the Court will assume that the Agreement does create a security interest rather than a lease.

It is undisputed that GMAC did not follow the appropriate procedure under Oklahoma law to have its lien noted on the certificate of title until September 6, 1988, which was within 90 days of the bankruptcy filing.[7] Assuming GMAC's security interest was not already perfected, the Trustee could avoid GMAC's action to perfect its security interest on September 6, 1988, as a preference under 11 U.S.C. § 547(b). However, it is also undisputed that, on or about the date of the Agreement, GMAC did follow appropriate procedures to obtain a certificate of title indicating GMAC as "owner" of the Vehicle. The issue is whether that action was adequate to perfect GMAC's security interest in the Vehicle under Oklahoma law.

■ The Oklahoma Supreme Court, in construing the immediate predecessor to the current certificate of title statute, held that case law under the Uniform Commercial Code concerning substantial compliance with perfection requirements is applicable in construing perfection requirements under the certificate of title statute. *Woodson v. Ford Motor Credit Co.*, 637 P.2d 588, 591 (Okl.1981) and *Woodson v. General Motors Acceptance Corp.*, 635 P.2d 601 (Okl.1981). In the latter case, the Oklahoma Supreme Court held that the policy underlying the perfection and recordation of security interests is to provide *notice to interested parties* and the Court specifically considered whether a third party would be *prejudiced* by a lienholder's failure to strictly comply with the certificate of title statute. *Woodson v. GMAC* at 603. In light of these cases, the Court finds that GMAC's action in obtaining a certificate of title listing it as "owner" of the Vehicle gave notice to interested parties of its interest in the Vehicle so that no third party could be prejudiced by GMAC's failure to have its lien noted on the title. Therefore, under Oklahoma law, GMAC substantially complied with the requirements for perfecting its security interest, and the Court finds that such security interest is perfected. In reaching this conclusion, the Court respectfully declines to follow the decision of Judge Wilson in *In re Thompson*, 101 B.R. 658 (Bankr.N.D.Okl. 1989), in which Judge Wilson concluded

---

**6.** In figuring the Debtors' payment obligation, the Court also did not include the approximate option price of the Vehicle because, as explained above, Debtors were not "obligated" or economically compelled to pay the option price.

**7.** GMAC did not deliver a lien entry form with the Oklahoma Tax Commission as required under 47 O.S. § 1110(A)(1) (Supp.1989) until September 6, 1988.

that "a security interest in a motor vehicle is perfected solely by delivery of a lien entry form to the Oklahoma Tax Commission ..." See *Thompson* at 677.[8] The Court notes that the overwhelming majority of cases faced with this issue have reached the same conclusion as the instant decision in construing other state certificate of title statutes. See *In re Circus Time, Inc.*, 641 F.2d 39 (1st Cir.1981); *In re Load–It, Inc.*, 774 F.2d 1077 (11th Cir. 1985); *In re Yeager Trucking*, 29 B.R. 131 (Bankr.D.Colo.1983); *In re Coors of the Cumberland, Inc.*, 19 B.R. 313 (Bankr.M. D.Tenn.1982); *In re National Welding of Michigan, Inc.*, 61 B.R. 314 (W.D.Mich. 1986); *In re Loague*, 25 B.R. 940 (Bankr.N. D.Miss.1982); *In re McCall*, 27 B.R. 106 (Bankr.W.D.N.Y.1983); *In re Trivett*, 12 B.R. 373 (Bankr.E.D.Tenn.1981).

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Trustee's Complaint be, and hereby is, denied for the reasons stated above.

EXHIBIT A

8. It is not clear whether Judge Wilson considered the argument that lessors in *Thompson* had "substantially complied" with Oklahoma perfection requirements since there is no discussion of that issue.

10. **OPTION TO PURCHASE.** Provided you are not in default, you will have the option to purchase the vehicle at the scheduled termination of this lease (Item 8 above) for its Fair Market Value If you advise Lessor no later than 30 days prior to the scheduled termination  For the "Market Value" will be the average of the retail and wholesale values stated in a then current vehicle guidebook selected by Lessor  For this purpose  the value established will be the "clean" or "average" value of a like vehicle including options and with the mileage that would have accrued if the vehicle had been operated in accordance with the Excess Mileage Charge provision of the lease (Item 15 below)  Upon early termination  you will have the option to purchase the vehicle for the greater of its Fair Market Value or the amount due Lessor under Paragraph 14(c)(i)  In addition, you will also be responsible for any fees and taxes in connection with the purchase of the vehicle

11. **WARRANTIES.** The vehicle is subject to the manufacturer's warranties which accompany the vehicle and any extended warranties or service contracts purchased by you which are listed in Item 1 above.

12. **MAINTENANCE, REPAIRS AND OPERATING EXPENSES.** You will pay for all maintenance and repairs to keep the vehicle in good working order and condition and any other expenses associated with operating the vehicle. You will service the vehicle according to the manufacturer's recommendations as outlined in the Owner's Manual and the Maintenance Schedule folder  or as requested by the manufacturer in connection with any recall campaign  You will return the vehicle at the end of the lease in good condition with no excessive wear and use.

13. **STANDARDS FOR WEAR AND USE.** Excessive wear and use includes, among other things  (a) glass breakage or discoloration (b) damage or deterioration of body, fenders, metal work, trim or paint; (c) missing wheel covers, jack or wheel wrench, (d) torn dash  floor covers seats, headliners, upholstery or interior work or trunkliners; (e) any wheels or tires (including spare) that are missing or not in safe condition; (f) damage from flood water, hail, sand; or (g) any damage that makes the vehicle either unsafe or unlawful to operate

14. **EARLY TERMINATION AND DEFAULT.**
(a) Provided you are not in default, you may terminate this lease prior to its scheduled termination (Item 8 above) if you give the Lessor 15 days written notice  Upon early termination, your obligation will be determined under Paragraphs 14(c)(i) and 14(c)(ii).

(b) You will be in default if any of the following occur: (1) You do not make a payment when due; (2) You or your property are the subject of a proceeding in bankruptcy, receivership or insolvency or you make an assignment for the benefit of creditors (3) You fail to comply with the insurance requirements of the lease; (4) You fail to maintain or repair the vehicle as required by the lease, (5) You have made any material misrepresentation on your Lessee Statement; (6) You fail to answer traffic summons or pay fines when due, or (7) You fail to comply with any other terms or conditions of the lease. If you are in default, Lessor may terminate this lease prior to the scheduled term  Your obligation to Lessor will then be determined in accordance with Paragraphs 14(c)(i) and 14(c)(ii).

(c)(i) Upon early termination, Lessor will calculate the remaining amount you owe by totaling the unmatured Fixed Monthly Rental Charges for the remaining scheduled term. Lessor then will add the residual value of $ 3047.46 _____ plus any past due Monthly Payments and additional amounts owed by you, and subtract any unearned Charges. The unearned Charges will be determined by applying the Rule of 78's to the amount of $ 2443.95 _____ To this total amount will be added $600 if the lease is terminated within 12 months of inception, $400 if terminated within 13-24 months, or $200 if terminated within 25-36 months.

(c)(ii) If the vehicle is not purchased by you under the provisions of Paragraph 10 above, Lessor will sell it at wholesale in a commercially reasonable manner and apply the greater of the amount of the net proceeds as defined below or the residual value to the amount determined in Paragraph 14(c)(i). If there is a balance due, you agree to pay it promptly  Any surplus will be kept by Lessor  To arrive at the net proceeds of sale  Lessor will subtract from the proceeds of sale the reasonable costs of preparing the vehicle for sale and selling it  If Lessor terminated the lease pursuant to Paragraph 14(b), then Lessor also will subtract the costs of taking and storing the vehicle, and reasonable attorney's fee if permitted by law.

(d) To the extent that the amount you owe is based on the value of the vehicle at the end of the lease term, if you disagree with the value Lessor assigns to the vehicle, you may obtain at your expense, from an independent third party agreeable to you and Lessor  a professional appraisal of the wholesale value of the vehicle which could be realized at sale  The appraised value shall then be used as the actual value

15. **EXCESS MILEAGE CHARGE.** If you do not buy the vehicle at the scheduled end of the lease (Item 10 above) you agree to pay an excess mileage charge. This charge is in addition to other amounts you may owe under this agreement. It will be at a rate of six cents (6¢) per mile for all miles driven over_____72000_____ .

If the lease ends early and you do not buy the vehicle (Item 10 above), you also agree to pay an excess mileage charge  It will be at the above rate for all miles driven over_____1500_____ per month times the number of months elapsed in the lease term

During the lease if, on a pro-rata yearly basis, the actual mileage exceeds the above, you will pay the excess mileage charge as soon as the Lessor asks for it  This payment will be considered an additional security deposit.

**YOU AGREE TO ALL THE PROVISIONS ON BOTH SIDES OF THIS LEASE AGREEMENT.**

YOU SIGNED THIS AGREEMENT AT_____Tulsa_____  _____Oklahoma_____ AND RECEIVED A COPY ON _____May 30_____ 19 86 .
                                        (City)            (State)

LESSEE SIGNS _____Timothy L. Thummel_____    CO-LESSEE SIGNS _____Mary V. Thummel_____

LESSOR SIGNS  GMAC BY _____  Dunnahoo & Associates Leasing

**NOTICE:** See other side for Additional Terms

## ADDITIONAL TERMS

16. **INSURANCE.** You will at all times during the term of this lease maintain at your expense insurance of the types and in the amounts specified in Item 2. The policies must reflect GMAC as an "Additional Insured" and loss payee. This coverage must be written by a carrier acceptable to Lessor and which is authorized to do business in the state where you live or garage the vehicle. You will provide appropriate evidence of this coverage to Lessor upon request.

17. **SECURITY DEPOSIT.** You will pay a refundable security deposit as indicated in Item 3 (d). Lessor will deduct from the deposit any obligation resulting from your default or abuse of the vehicle and any other charges you may owe under this lease. Lessor may retain the security deposit until all amounts you may owe under this lease are paid.

18. **USE.** You will allow only licensed drivers to operate the vehicle. You will keep the vehicle free of all fines, liens and encumbrances. You agree to pay any such fines or remove any such liens and encumbrances immediately. If you do not, Lessor may do so and any amounts paid by Lessor shall be an additional amount owed by you under this lease. You will not use the vehicle illegally, improperly or for hire. You will not use the vehicle to pull trailers. You will not remove the vehicle from the United States or Canada. You will not alter, mark or install equipment in the vehicle without Lessor's written consent.

19. **WARRANTIES.** You are authorized to receive the benefits of manufacturer's warranties on behalf of Lessor. In the event of a

dispute regarding the manufacturer's warranties, you agree to use the manufacturer's dispute resolution system before taking any other action. You will continue making Monthly Payments to Lessor in the event of such a dispute. You may not withhold payments from Lessor, and you agree that the Monthly Payment is not subject to any defenses, set-off, counterclaim or recoupment related to claims you may have against the manufacturer, dealer or any third party.

You understand that Lessor is not offering any express or implied warranties and that Lessor offers no implied warranties of merchantability or fitness for a particular purpose covering the vehicle.

20. **RETURN OF VEHICLE AT SCHEDULED LEASE TERMINATION.** At the end of the lease, if you do not purchase the vehicle, you will return the vehicle to Lessor at point of delivery in good condition without damage or excessive wear and use and pay any amounts you may owe under this lease.

21. **LICENSE, REGISTRATION, TAXES AND INSPECTION.** You will be responsible for payment for titling, registration and licensing and for all inspections of the vehicle required by any government authority, during the lease term. You must pay all excise, use, personal property, gross receipts and other taxes incurred during the term of the lease with respect to the use and operation of the leased vehicle, except those levied on the net income of Lessor.

22. **THEFT, DESTRUCTION AND SUBSTITUTION.** If the vehicle is destroyed or otherwise rendered unsuitable for use (as deter-

mined by Lessor) by fire or accident or is stolen, your liability to Lessor will be determined in the manner described in Paragraphs 14(c)(i) and 14(c)(ii), except that the amount of any settlement received from your insurance company will be treated as the vehicle's sale price. At Lessor's election, Lessor may arrange for you to continue the lease by substituting a comparable vehicle.

**23. INSPECTION.** Lessor may inspect the vehicle at any reasonable time. If Lessor asks to inspect the vehicle, you will tell Lessor the location of the vehicle and allow the inspection. If the vehicle is damaged or there is excessive wear and use, Lessor will decide if the vehicle is reasonably repairable If the vehicle is reasonably repairable, you will promptly have the necessary repairs made when Lessor asks you to do so.

**24. DEFAULT.** If you are in default (see Paragraph 14(b)) Lessor will have the rights and remedies provided by law. Lessor will have the right to sue you for damages and/or recovery of the vehicle

Lessor may take the vehicle from you without demand To take it, Lessor may enter your premises or the premises where the vehicle is stored, so long as it is done peacefully. If there is any personal property in the vehicle when Lessor takes it from you. Lessor can take it and store it for you

The taking of the vehicle by Lessor shall be considered an Early Termination and you will not be released from any obligation under this lease. You will be charged the reasonable expenses of taking and storing the vehicle. You will also be charged reasonable attorney's fees and legal expenses incurred by Lessor, to the extent permitted by law. The amount you will owe will be determined by Paragraphs 14(c)(i) and 14(c)(ii).

**25. OWNERSHIP.** This is a lease only and Lessor remains the owner of the vehicle. You will not transfer, sublease, rent, or do anything to interfere with Lessor's ownership of the vehicle You and Lessor agree that this lease will be treated as a true lease for Federal Income Tax purposes and elect to have Lessor receive the benefits of ownership (IRC sec. 168(f) (8)).

**26. INDEMNIFICATION.** You agree that the Monthly Payment will not be subject to any defenses, set-off, counterclaim or recoupment. You also agree to indemnify and hold Lessor and its assignees and employee harmless from all losses, damages, injuries, claims demands and expenses arising out of the condition, maintenance, use or operation of the vehicle.

**27. SEVERABILITY AND VENUE.** If any part of this lease is not valid according to law, all other parts will remain enforceable. The law at the place of signing this lease will govern.

**28. TOTALITY OF AGREEMENT.** This lease contains the entire agreement between you and Lessor. There are no other agreements between you and Lessor except those included in writing in this lease. No change or other agreement will be binding unless in writing and signed by you and Lessor

**29. ASSIGNMENT.** You agree that this lease or any rentals may be assigned by Lessor. You have no right to assign this lease.

**30. AUTHORITY OF ARRANGING ENTITY.** The entity arranging this lease is authorized to execute this lease on behalf of GMAC. Neither that entity nor any of its employees is authorized to make any oral or written promise, affirmation, warranty or representation to you other than those reflected in writing in this lease.