In re Charles E. COLE, Debtor.

Fred W. WOODSON, Appellant,

v.

FORD MOTOR CREDIT
COMPANY, Appellee.

In re Donna G. THOMPSON, Debtor.

Fred W. WOODSON, Appellee,

v.

FORD MOTOR CREDIT
COMPANY, Appellant.

Bankruptcy Nos. 88–02921–C,
86–01522–W.
Adv. Nos. 89–0033–C, 86–0299–W.
Nos. 89–C–440–C, 89–C–549–C.

United States District Court,
N.D. Oklahoma.

April 18, 1990.

James W. Keeley, Tulsa, Okl., Kent Meyers, Karen Eby, Crowe & Dunlevy, Oklahoma City, Okl., for appellant.

Joe Fears, Thomas G. Marsh, Tulsa, Okl., for appellee.

## ORDER

H. DALE COOK, Chief Judge.

In this consolidated appeal, the Court is asked to review conflicting rulings by the District's two bankruptcy judges in characterizing written agreements as either leases or secured installment sales contracts. This appeal stems from ten adversary proceedings, each under a separate Chapter 7 bankruptcy case. The basic fact pattern in all of these proceedings is virtually identical. Each debtor signed a written agreement, described as a lease, with a Ford or Lincoln–Mercury dealership. Under this agreement, the debtor acquired the use of a vehicle for a specified period of time (usually 48 months). The debtor agreed to make monthly payments during the term of the "lease" and to make various other payments for insurance and maintenance on the vehicle.

Upon reaching agreement with a debtor to "lease" its vehicle, the Ford or Lincoln–Mercury dealership immediately assigned the agreement to Ford Motor Credit Company (FMCC), who purchased the vehicle from the dealership. The debtor thus made his monthly payment to FMCC. However, each debtor filed a voluntary petition for relief under Chapter 7 before making all of the required monthly payments pursuant to his written agreement.

The Trustee brought these adversary proceedings, pursuant to 11 U.S.C. § 544, to avoid the interests of FMCC in the vehicles it allegedly leased to each of the debtors. The Trustee argued that the agreements were not true leases, but rather were intended to create security interests in FMCC, which were unperfected due to FMCC's failure to file lien entry forms, as required by Oklahoma law. Under § 544, the Trustee asserted a priority in the vehicles over the allegedly unperfected liens held by FMCC.

Nine of the adversary proceedings were consolidated for trial before one bankruptcy judge; a later adversary proceeding was

heard by the District's other bankruptcy judge. The bankruptcy judges issued memorandum decisions and orders in which they reached completely opposite conclusions concerning the nature of the agreements between the debtors and FMCC. In *In Re Cole,* 100 B.R. 561 (Bkrtcy.N.D.Okla. 1989), the judge held that the debtor's agreement with FMCC was a lease, giving FMCC an ownership interest in the vehicle. *Id.* at 565. The district's other bankruptcy judge issued his order two months later, *In Re Thompson,* 101 B.R. 658 (Bkrtcy.N.D. Okla.1989), finding the agreements to be "disguised" secured installment sales contracts, thereby leaving FMCC an unperfected security interest which the Trustee could avoid under 11 U.S.C. § 544. *Id.* at 677. Both orders were appealed. Based upon an identity of facts and issues, the two appeals were consolidated for consideration by this Court.

A review of the agreement in issue discloses that all are on essentially the same printed form, entitled "Net (Closed End) Lease", and contain virtually identical provisions. Each agreement provided that the debtor or "lessee" would pay a basic monthly payment comprised of the monthly rental fee and the use or rental tax. The monthly rental fee was composed of two elements: (1) depreciation of the vehicle over the term of the lease, and (2) charges for the use of the vehicle. At the agreement's inception, the "lessee" was also required to pay a refundable reconditioning reserve, a sort of security deposit to offset any abnormal wear and tear on the vehicle. A "lessee" also was required to pay an excess mileage charge, consisting of several cents per mile for each mile driven in excess of a specified maximum; this charge was to be paid at the end of the agreement's term. A "lessee" agreed to provide all necessary maintenance to keep his vehicle in good working order and to maintain damage and liability insurance on his vehicle during the term of the agreement. A "lessee" also agreed to pay all taxes and registration, title and licensing fees for his vehicle.

Each of the agreements also provided that the "lessee" could not unilaterally terminate his obligations before the expiration of the agreement's term, without having to pay all amounts owed to FMCC over the full term of the agreement. At the end of the term, a "lessee" had the option to purchase his vehicle at a price determined at the agreement's inception. This price was equal to the vehicle's forecasted fair market value at the end of the term. The "lessee" could exercise the purchase option only at the end of the agreement term. If the "lessee" chose not to exercise the purchase option, he returned the vehicle to FMCC and had no further obligation to FMCC for the remaining economic value of the vehicle.[1] FMCC had no duty under the agreements to sell the vehicle returned to it by the "lessee". FMCC's employee testified, however, that FMCC had found no rental market for the subsequent re-leasing of these returned vehicles. It is therefore FMCC's practice to sell the returned vehicles at auction. *See* Partial Transcript of Trial Proceeding: Testimony of Clifford R. Damaska, pp. 30–31 [hereinafter cited as "Damaska"].

The Court turns now to the allegations of error raised against the *Cole* and *Thompson* decisions. In reviewing these two conflicting decisions, the Court must accept the findings of fact of the bankruptcy judge, unless they are clearly erroneous. Bankruptcy Rule 8013; *In Re Reid,* 757 F.2d 230, 233 (10th Cir.1985). The bankruptcy judge's legal conclusions are reviewed *de novo. In Re Mullet,* 817 F.2d 677, 679 (10th Cir.1987).

The Trustee has alleged four errors in *Cole* for the Court's review. First the Trustee criticizes *Cole* for its application of the 1988 amended version of Okla.Stat. tit. 12A § 1–201(37). Second, the Trustee deems erroneous the judge's failure in *Cole* to recognize FMCC's lack of a reversionary interest in the vehicles returned to FMCC.

---

**1.** At the end of the agreement's term, the "lessee" may be required to pay for any excess mileage or abnormal wear and tear on the vehicle. Once these amounts are settled, however, the "lessee" then "walks away" from the vehicle. Damaska, at 27.

The Trustee argues that any such reversionary interest is extinguished by FMCC's practice of selling the vehicles soon after the agreements' terms end. The Trustee next ascribes error to *Cole*'s treatment of the vehicles' "residual value". The Trustee contends the judge treated "residual value" as always being equal to or greater than the actual fair market value, yet the judge was oblivious to FMCC's willingness and ability to reduce the vehicle's "residual value" below fair market value by imposing higher monthly payments. Finally, the Trustee argues that *Cole* overlooked the possibility that the "lessee" could decline to exercise the purchase option under the agreement, but might later appear and bid for the vehicle at auction.

■ According to the Trustee, the judge in *Cole* should have refused to apply the amended version of § 1–201(37) to the proceedings pending before him, as did the bankruptcy judge in *Thompson*.[2] In 1988, the Oklahoma legislature added Article 2A, governing lease transactions in goods, to the State's version of the Uniform Commercial Code. At the same time it enacted Article 2A, the legislature also amended § 1–201(37), which contained guidelines for distinguishing a lease transaction from a security interest. In *Cole*, the bankruptcy judge held the 1988 amendment to § 1–201(37) to be applicable to the debtor's agreement with FMCC, finding that the 1988 amendment made no substantive changes, but only "clarified" a "confusing" area of the law. 100 B.R. at 563. Conversely, the other bankruptcy judge declined, in *Thompson*, to apply the 1988 amended version of § 1–201(37), on grounds that the agreements were made in 1984 and 1985. The *Thompson* court cited commentary to Article 2A, which noted that the Article applied to transactions entered into and events occurring after its effective date. 101 B.R. at 668. The *Thompson* Court also concluded that the amended § 1–201(37) changed prior case law from the Tenth Circuit which had applied the previous version of § 1–201(37)

distinguishing leases from agreements creating security interests. *Id.* at 669. The *Thompson* court therefore elected to use that pre–1988 case law to characterize the agreements, instead of proceeding under the 1988 amended version of § 1–201(37). *Id.*

The Court has reviewed the previous and the amended versions of Okla.Stat. tit. 12A § 1–201(37), the uniform law version of that statute and the Oklahoma and uniform law commentary interpreting it. From its review, the Court can discern no express prohibition to applying the 1988 amended version of § 1–201(37) to the various debtors' agreements made with FMCC in 1984, 1985 and 1986. The Oklahoma commentary cautions that Article 2A should not be applied to transactions occurring before that Article's effective date. *See* Okla. Stat. tit. 12A § 2A–101 *et seq.* (Supp.1989), Miller, "Commentary on Uniform Commercial Code Article 2A—Leases as Enacted in Oklahoma", at 78 [hereinafter cited as "Miller"]. However, Article 2A's provisions are not in issue here, and the Court finds no reason to extend that cautionary note to the concurrently amended § 1–201(37), which had a prior and separate existence before the addition of Article 2A to the Oklahoma Commercial Code.

It appears to the Court that the 1988 amendment merely revised § 1–201(37) to further aid courts in drawing lines between leases and agreements creating security interests. The amendment did not change the substantive law. The Oklahoma commentary to Article 2A noted that "the revised definition of security interest in § 1–201(37) codifies the better case law construing the former provision so as to provide additional statutory guidance as to the relevant considerations in making the determination of whether a lease instead is a security interest." Miller, at 83. The official comments to the uniform version of the amended § 1–201(37) also observe that "the task of sharpening the line between true leases and security interests disguised

---

**2.** In its appeal of *Thompson,* FMCC has alleged error in the judge's refusal to apply the amended Okla.Stat. tit. 12A § 1–201(37) to the consol-

idated proceedings. The Court therefore also will consider here whether *Thompson* erred in refusing to apply that amended statute.

as leases continues to be a function of this section." *See* U.C.C. § 1–201(37) official comment (1988).

The *Thompson* court considered the application of the 1988 amendment of § 1–201(37) to FMCC's agreements made in 1984 and 1985 to be retroactive and therefore impermissible. 101 B.R. at 669. From this Court's comparison of § 1–201(37) and its 1988 amended version, the Court finds that no substantive changes were made to that statute which would prevent the application of the amended version in pending proceedings such as these. The amendment to § 1–201(37) does not remove or impair any potential vested rights of the parties, nor create any new obligations, duties or disabilities with respect to the FMCC agreements made in 1984, 1985 or 1986. The Court concurs in the commentators' observations, as well as the *Cole* court's statement, that the 1988 amendment merely clarified the factors that distinguish a lease from a secured transaction which already had been enunciated in various decisions. *See* Miller at 83; U.C.C. § 1–201(37) official comment (1988); *Cole*, 100 B.R. at 563. The Court thus does not view the application of the amended § 1–201(37) to these proceedings to present any "dangers" which may occur in a retroactive statutory application. *See Thompson*, 101 B.R. at 669.

The *Thompson* court declined to apply the 1988 amendment to § 1–201(37) because the amendment purportedly changed previous Tenth Circuit case law and decisions from this District's bankruptcy court distinguishing a lease from a secured transaction. *Id.* This Court did not locate any Oklahoma state court decisions construing § 1–201(37). While the federal court decisions cited in *Thompson* are helpful in providing those courts' interpretations of Oklahoma law, they cannot be substituted for the state statute. The Court concludes that amended Okla.Stat. tit. 12A § 1–201(37) (1988) should have been applied in all of these proceedings.

■ The facts do not support the Trustee's argument that FMCC's reversionary interest in the vehicles returned to it is extinguished by FMCC's subsequent sale of those vehicles. At the end of an agreement's term, a "lessee" who does not exercise the purchase option must return the vehicle to FMCC. Upon the vehicle's return, FMCC regains the rights of use and possession of the vehicle which had been enjoyed by the "lessee". At that point, FMCC's reversionary interest to the use and possession of the vehicle is vested. The "lessee" has no further claim to or interest in the vehicle, and the transaction between FMCC and the "lessee" has been concluded. With all rights to the vehicle vested in FMCC, FMCC's subsequent disposition of its vehicle has no bearing upon or relevance to the concluded transaction with the "lessee". The Court finds no legal compulsion for FMCC to sell the returned vehicle; rather, the decision to sell appears to be made only for FMCC's economic self-interest. Of course, FMCC's sale of the returned vehicle extinguishes *all* of FMCC's interest in and rights to the vehicle, but that subsequent extinguishment bears no relationship to the prior transaction to affect its characterization as a lease or secured sale. The Court thus finds no merit in the Trustee's second allegation of error.

The Trustee's criticisms of the *Cole* court's treatment of "residual value" are similarly unsupported by the evidence. The Trustee cited no evidence to contradict the testimony of FMCC's employee that the purchase option price must be equal to or greater than the lease end value, thereby making it equal to or greater than the estimated fair market value at the agreement's termination. *See* Damaska, at 22–23. The Trustee's conjecture that FMCC could reduce a vehicle's "residual value" below fair market value by setting a higher monthly payment does not refute the testimony of FMCC's employee, who noted that competition in the vehicle leasing marketplace provided FMCC with the incentive to offer the lowest monthly payment rates possible. *Id.* at 32–33. That employee also cited low monthly payment rates as one of the touted advantages for a consumer to use FMCC's leasing program, rather than

purchasing the vehicle. *Id.* at 32. The Court thus finds no clear error in *Cole*'s treatment of the "residual value" issue.

Finally, no evidence appears in the record to support the Trustee's speculation that a "lessee" might decline to exercise the agreement's purchase option, but would later appear and bid for the vehicle when FMCC consigned it for auction. Even if such evidence were present, it would be irrelevant.

The Court turns now to examine FMCC's allegations of error in *Thompson.* The Court has already addressed FMCC's assertions of error in *Thompson*'s failure to apply the 1988 amended version of § 1–201(37) in the consolidated proceedings there. FMCC also asserts that even if the pre–1988 version of § 1–201(37) were applicable here, the bankruptcy court in *Thompson* nevertheless committed several errors which caused it to wrongly conclude that FMCC agreements were not leases. First, FMCC argues that *Thompson* erred in its emphasis upon and application of the test set out by the Tenth Circuit in *In Re Fashion Optical, Ltd.,* 653 F.2d 1385 (10th Cir. 1981). Secondly, FMCC contends that *Thompson* erred in its finding that the FMCC agreements were in "economic reality" the equivalent of "open-end" leases. Finally, FMCC alleges that *Thompson* erred in its method of computing the amounts FMCC was to have received under the agreements, which thus caused *Thompson* to characterize the "overages" it computed as "interest".

In its *Fashion Optical* decision, the Tenth Circuit, construing Okla.Stat. tit. 12A § 1–201(37) (1971), set forth a test for determining whether an agreement was a lease or a secured transaction. 653 F.2d at 1388–89. The Tenth Circuit offered the following four-step approach to making that determination: 1) "the presence of a purchase option does not automatically preclude a finding of [a] true lease"; 2) "if a purchase option exists and it or other terms in the 'lease' permit the 'lessee' to become full owner by merely paying no or nominal consideration after complying with its terms, the inquiry ends" and the "lease" is

considered to be a secured transaction; 3) "if the option does require greater than nominal consideration for full ownership, a true lease is usually found"; 4) the absence of a purchase option does not automatically imply a true lease; even if the agreement does not permit purchase at nominal consideration, "the 'lease' will be deemed one intended as security if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot". *Id.*

The agreement in issue in *Fashion Optical* provided a purchase option. However the test could not be applied because the evidence gave no indication of whether the consideration required was nominal. *Id.* at 1390. The same four-step approach was taken later by the Tenth Circuit in *In Re Tulsa Port Warehouse Co., Inc.,* 690 F.2d 809 (10th Cir.1982). In that case, the Tenth Circuit specifically addressed a purported automobile lease, which had no purchase option. The Tenth Circuit then used the fourth step to evaluate the "economic realities" of the agreement to find a secured transaction. *Id.* at 811–12.

FMCC argues that *Thompson* improperly applied the fourth step "economic realities" test to the agreements in issue here, all of which contain a purchase option. According to FMCC, the fourth step should be applied only to agreements which have no purchase option. FMCC points to the Tenth Circuit's construction of the *Fashion Optical* test in *Tulsa Port,* when the court stated that "[w]e pointed out that *when a lease does not contain a purchase option,* the lease will still be deemed as security if the facts otherwise expose economic realities tending to confirm that a secured transfer of ownership is afoot." *In Re Tulsa Port Warehouse Co., Inc.,* 690 F.2d at 811 (emphasis added). In the *Tulsa Port* decision, however, the agreements lacked purchase options and it may be that the Tenth Circuit was specifically addressing that fact in the statement of the test just quoted.

The language in *Fashion Optical*'s fourth step appears to permit two interpretations: the one argued by FMCC which

restricts the test's application to non-option agreements, and that apparently taken in *Thompson*, which applies the test to agreements containing options for greater than nominal consideration. The Court has found no subsequent guidance from the Tenth Circuit on whether the fourth step "economic realities" test should be restricted to non-option agreements. The Court therefore categorically cannot pronounce as error *Thompson*'s application of the "economic realities" test to these agreements containing purchase options.

The Court, however, is more sympathetic to FMCC's criticism that *Thompson* emphasized and relied upon the "economic realities" test as the determinative factor in characterizing the agreements as creating security interests, almost to the exclusion of the other factors. Although the bankruptcy court had concluded that the Trustee had failed to prove that the purchase option prices were nominal and failed to establish that the "lessee" had an equity in the vehicle, the court indicated the priority it gave the *Fashion Optical* fourth step in declaring, "let battle be joined at the decisive point", as it prepared to delve into the "economic realities" of the transactions here. 101 B.R. at 672. Neither the *Fashion Optical* nor the *Tulsa Port* decision suggests that the "economic realities" step should be the predominant test to finding a lease or secured transaction. The Court therefore finds that *Thompson* erred in making its evaluation of "economic realities" the decisive factor in characterizing the FMCC agreements, especially where other factors indicated a lease.

FMCC additionally argues that even if *Thompson*'s application of the "economic realities" test was proper, *Thompson* erred in misconstruing facts in evaluating the "real-world operation" of the FMCC agreements. FMCC alleges that *Thompson* ignored the evidence that demonstrated that the agreements here were "closed-end" leases and instead determined that the agreements should be treated as "open-end" leases, similar to those deemed secured transactions in *Tulsa Port.*

In its *Tulsa Port* decision, the Tenth Circuit explained the difference between the two types of leases.

Under the closed-end leases, the lessee returns the vehicle to the lessor at the end of the lease term and the obligations of both come to an end. Under the open-end lease, however, the relationship between the lessor and the lessee does not end. Rather, it involves the sale of the vehicle and an adjustment between the lessor and lessee based on the [vehicle's] sale price.... 690 F.2d at 810 n. 1.

The Court finds nothing from its review of the evidence to indicate any obligation remaining on the "lessee" for the economic value of the vehicle once he returns it to FMCC at the end of the agreement's term. In *Thompson*, the bankruptcy court specifically found that the Trustee had not shown that the "lessee" bears any risk of loss or expectancy of gain in the vehicle's value at the end of the agreement's term. 101 B.R. at 671. However, *Thompson* focused upon FMCC's practice of selling the vehicles returned to it as a basis for finding the agreements should be treated as "open-end" leases. Despite the recognition that FMCC here was not legally required to sell the returned vehicles as it would have been under an actual "open-end" lease, *Thompson* nevertheless found that FMCC was under an "economic" compulsion to sell as forceful in operation as an express contractual requirement to do so.

In these cases, the leases do not legally require sale of the vehicles, and the vehicles retain some economic life beyond expiration of the lease periods—yet FMCC does not keep the vehicles to enjoy their remaining useful life, but sells them, either under the option purchases or, if the options are not exercised, at auction.... As a matter of fact, FMCC neither has nor wants any meaningful reversionary interest in these vehicles. FMCC is determined to sell them, quickly, to the former lessees or to anyone else who will buy them. Since there is no market of interest to FMCC for lease of used vehicles, the initial lease effectively commits FMCC to sale of the vehicle as soon as the initial lease ends.

Here, there is a legal semblance of a reversion, made to appear simply by deleting from the lease contracts any express requirement or acknowledgement that the vehicles will be sold after the expiration of the lease term. But the semblance is without substance—it lacks economic reality. In economic reality, there is no reversion; the fact that FMCC sells the vehicles as a matter of course despite the lack of legal compulsion to do so only emphasizes the compelling economic reality.

*Thompson,* 101 B.R. at 673–74.

*Thompson* clearly erred in concluding that FMCC lacks a reversionary interest in the vehicles returned to it because it thereafter sells those vehicles. Once the "lessee" has returned the vehicle and "walked away", his transaction with FMCC is concluded, and the reversionary interest in the use and possession of the vehicle is vested again in FMCC. So long as the "lessee" does not realize any loss or gain from FMCC's sale of the returned vehicle, it is completely immaterial to that concluded transaction whatever disposition FMCC chooses to make of the returned vehicle. Under the Tenth Circuit's definition of an "open-end" lease, it is not the mere fact of a sale alone that marks an agreement as an "open-end" lease; some accounting must be made between the "lessee" and FMCC with regard to the vehicle's sale price. *See Tulsa Port,* 690 F.2d at 810 n. 1. No evidence indicates that such an accounting occurs under the agreements in issue.

■ A court may not rewrite the parties' contract, nor read terms or provisions into the contract. *See Houston Oilers, Inc. v. Neely,* 361 F.2d 36, 42 (10th Cir.1966); *Sloan v. Mud Products,* 114 F.Supp. 916, 923 n. 20 (N.D.Okla.1953); *King–Stevenson Gas & Oil Co. v. Texam Oil Corp.,* 466 P.2d 950, 954 (Okla.1970). Although *Thompson* acknowledges that no express contractual requirement compels FMCC to sell the returned vehicles, *Thompson* suggests that the deletion of that requirement

was made to give the "semblance" of a reversion and avoid the label of an "open-end" lease. Through its evaluation of the "economic reality" of FMCC's business practice of selling its returned vehicles, *Thompson* reads FMCC's "compulsion" to sell into the agreements in issue, and then treats that "compulsion" as the absent contractual requirement to sell[3] indicative of an "open-end" lease. The Court has found no evidence of an "economic compulsion" to sell upon FMCC. *Thompson*'s treatment of the alleged "compulsion" as an unwritten term of the agreements in issue was clearly erroneous.

■ Finally, *Thompson* is alleged to have erred in computing the amounts FMCC would have received for its vehicles under the agreements. *Thompson*'s alleged error was in adding the purchase option price to the rental payments made by the "lessee" over the agreement's term. *Thompson* found that sum totalled more than the manufacturer's suggested retail price for the vehicle and deemed that overage to be "functionally equivalent" to interest paid in a secured installment sales contract. 101 B.R. at 672.

The Court agrees with FMCC that the purchase option price should not have been added to the rental payments made under the agreement. Although the agreement specifies the option price if the option is exercised, that amount is not an obligation upon the "lessee" under the agreement. The "lessee" is free to choose not to exercise the option and to "walk away" from the vehicle.

Thompson also misconstrued the option price as a "balloon" payment which the "lessee" would have to make to free his vehicle from FMCC's "security interest". *Thompson* noted that the "lessee" "may finance the final 'balloon' payment by reselling the car to another buyer, with the secured creditor [FMCC] as his auction agent." 101 B.R. at 674. This analysis is flawed, in that the "lessee" is not obligated to pay the option price under the agree-

---

**3.** *Thompson* noted that FMCC's practice of selling the vehicles returned to it was "as regular and predictable as if it were specified in the contracts, although it is compelled by economic rather than legalistic considerations." 101 B.R. at 673.

ments here. No evidence demonstrates any sort of agency relationship between FMCC and the "lessee", or that FMCC in any way acts on behalf of the "lessee" in selling the vehicle after the "lessee" returns it to FMCC. Rather, the evidence indicates that FMCC's sales of its returned vehicles are made strictly in its economic self-interest.

## CONCLUSION

From its review of the record, the Court concludes that these agreements are true leases, and not secured purchase contracts. FMCC thus has an ownership interest in the vehicles, which cannot be avoided by the Trustee.[4]

The Court finds no error in the findings of fact and conclusions of law made by the bankruptcy court in *In Re Cole*. The appeal of the Trustee should be DENIED. The order of the bankruptcy court in that case is hereby AFFIRMED.

From errors found in certain of the findings of fact and conclusions of law made by the bankruptcy court in the consolidated proceedings in *In Re Thompson*, the Court finds that the order of the bankruptcy court in that case should be REVERSED, with judgment to be entered in favor of appellant, Ford Motor Credit Company.

IT IS SO ORDERED.

---

4. Because it has determined that FMCC has an ownership interest in the vehicles, rather than a security interest, the Court will not address the issues concerning the perfection of security interests in vehicles under Oklahoma law.